FISHER v. NEWARK CITY ICE CO.

(Circuit Court of Appeals, Third Circuit. April 27, 1894.)

No. 8.

1. CONTRACT OF SALE—INTERPRETATION.

A contract provided that plaintiff should cut, house, and deliver on board defendant's vessels 15,000 tons of ice during the months of June, July, August, and September, at $1.60 per ton; to be paid for as follows: $3,750 on signing the contract; an equal amount the following March, if three-fourths of the whole was then stored in specified houses; 75 cents per ton additional as the ice was delivered until the amount advanced was exhausted; and thereafter $1.60 a ton,—the ice to become defendant's property when cut, provided, however, that plaintiff should have a right "to make up the quantity to be delivered as aforesaid by purchase or otherwise," indemnifying defendant for any additional expense occasioned thereby. Held, that plaintiff was bound to store in his own houses three-fourths of the entire amount as security for the advances, but that any ice purchased under the proviso need not be stored in his own houses, but might be delivered elsewhere, plaintiff paying any additional expense thereby caused.

2. SAME—DAMAGES FOR BREACH.

The measure of damages for breach of contract where there had been a part payment and partial delivery held to be not the balance of the purchase money, but only the profit the seller would have made if the delivery had been completed.

In Error to the Circuit Court of the United States for the District of New Jersey.

This was an action by Fred. S. Fisher against the Newark City Ice Company to recover damages for breach of a contract. The case was tried to the court without a jury, and judgment rendered for defendant. Plaintiff sued out this writ of error.

The circuit court made the following findings of fact:

(1) The plaintiff and the defendant entered into and executed a contract dated February 13, 1890, for the sale and delivery of 15,000 tons of ice by the plaintiff to defendant, which contract is made part of the declaration in this cause.

(2) That in pursuance of the terms of that contract the defendant paid to the plaintiff on the day aforesaid $3,750, part of the consideration thereof.

(3) The subject-matter of this contract was the delivery of 15,000 tons of ice by the plaintiff to the defendant at a certain fixed price per ton. Such ice, previous to delivery, was to be stored in certain buildings then erected, or to be erected, and in said contract particularly stated. In said contract there was this proviso: "Provided, however, said Fred. S. Fisher shall have the right to make up the quantity to be delivered as aforesaid by purchase or otherwise, indemnifying the said Newark City Ice Company for any additional expense they may be put to."

(4) The ice which was the subject of the sale, and was to be delivered pursuant to the terms of the contract, was to be cut from the Kennebecasis river, in front of certain lands leased or controlled by the plaintiff, and was, by the terms of the contract, to be stored in the building then in course of erection or to be erected by the said plaintiff upon lands owned by the said plaintiff, and situated on the Kennebecasis river, in the parish of Rothesay, and county of Kings, being the same land which the plaintiff had previously bought from one Susanna Hicks.

(5) By the terms of the contract, or of a supplemental contract, hereafter referred to, the said plaintiff was permitted to store a certain portion of said ice, if necessary, in a building to be erected upon lands leased by him from the Wetmore estate in the immediate neighborhood of the other ice house, or in any other building to be approved by the defendant. At the time that said contract was made the plaintiff was engaged in cutting ice at the places named.

(6) Afterwards, on the 7th day of April, 1890, a certain supplemental contract was entered into between the plaintiff and the defendant, which is attached to the declaration, and forms a part thereof. This contract, under the view I take of the case, is of no special consequence.

(7) The ice in question was to be delivered to the defendants during the months of June, July, August, and September of that year; such delivery was to be made "free on board" certain vessels suitably and properly dunnaged for a voyage from the place of delivery to Newark, which vessels were to be furnished by the defendant.

(8) The defendant did send to the place of delivery, to wit, the ice houses heretofore spoken of, vessels upon which, at intervals, the plaintiff did deliver the ice in question up to about September 10, 1890.

(9) On or about that day it came to the knowledge of the defendant's agents that practically all the ice stored in the ice houses referred to had been delivered; the quantity remaining being variously estimated by the different parties, but admittedly less than a cargo.

(10) The plaintiff in fact stored 11,250 tons of the ice which was to be delivered in the building mentioned in the contract.

(11) On September 10, 1890, the agent of the defendant served upon the plaintiff personally a notice, of which the following is a copy:

"St. Johns, N. B., 10 Sept., 1890.

"Frederick Fisher, Esq., City—Dear Sir: By your contract of the 13th of Feby., A. D. 1890, with us, you agreed to cut and deliver to us 15,000 tons of ice, to be packed and delivered f. o. b. on board of vessels properly dunnaged

for a voyage to Newark during the months of June, July, August, and September, for which we are to pay you the sum of $1.60 per ton; said ice to be stored in the building named in the said contract. A large sum is still due us for advances made to you on said contract, and we have removed all the ice in said building with the exception of a small amount, not enough for a cargo, and would now call on you to fulfill said contract.

"[Signed]                                          Newark City Ice Co.
                                                "Per S. D. Addis, Agt."

(12) Although, upon receipt of this notice, the plaintiff expressed his intention to fulfill his contract according to its terms, the only action he took thereafter was to offer ice to the amount of a cargo or more from Palmer's ice house, and the tender of ice, made at Newark, as hereinafter stated.

(13) At the date of the second supplemental contract, to wit, April 7, 1890, the defendants paid the further sum of $3,750 as part of the consideration of said principal contract.

(14) During the months of June, July, August, and September the plaintiff delivered on board of vessels furnished by the defendant 6,156 45-2000 tons of ice, being parcel of the 15,000 tons to be furnished under the contract.

(15) The ice was to be paid for by the defendants, in addition to the $7,500 advanced, at the rate of 75 cents per ton as the ice was shipped; said 75 cents per ton to be paid by sight drafts drawn by the said plaintiff on the said defendant, with bill of lading attached, and weight of ice to be verified by sworn weighers, whose certificates were to be attached to the bill of lading. On repayment in full of said advance by delivery of ice, sight drafts, as aforesaid, were to be drawn for the ice thereafter shipped at $1.60 per ton.

(16) That on or about September, 1891, and after the ice stored as per contract had been exhausted, the plaintiff offered to the defendant, through his agents, Charles A. Palmer and Charles H. Fisher, under the contract, 2,389 1294-2000 tons of ice, then being on vessels afloat and in the port of New York or elsewhere, which ice, it was alleged by the plaintiff, came from the Kennebecasis river, and was of the same quality as the ice required by said contract; also 4,000 tons of ice of a similar character, then stored in ice houses on the river Kennebeasis, but not in the houses mentioned in said contract; and 4,000 tons of similar ice, then stored at Chamcook, a place about 50 miles distant from the place where the other ice was stored under the contract.

(17) While the evidence is exceedingly unsatisfactory as to the title to the ice in the vessels afloat in New York harbor and elsewhere, for the purposes of this decision I assume that such ice was owned by the plaintiff.

(18) The title to the ice at Chamcook was admittedly in the plaintiff and his brother as joint owners.

(19) For the ice actually received by the defendant the plaintiff has been fully paid.

Roger Foster, for plaintiff in error.

John R. Emery, for defendant in error.

Before ACHESON and DALLAS, Circuit Judges, and BUTLER, District Judge.

BUTLER, District Judge. In this case, (which was tried without a jury,) involving the construction of a contract, and the defendant's alleged liability for failure to perform, forty-eight errors are assigned. Most of them are unnecessary, and many are trivial. Such a practice tends to waste of time, and obscurity, and deserves discouragement.

The only assignment which requires notice is that involving the construction of the contract. The instrument is inartificially and carelessly drawn; but the intention of the parties is, we think, reasonably clear. It provides, substantially, that the plaintiff shall cut, house and deliver on board the defendant's vessels, 15,000 tons

of ice, of a given quality, during the months of June, July, August, and September, 1889; the defendant paying therefor $1.60 per ton, as follows: $3,750 on signing the contract, a further sum of equal amount the following March, in case three-fourths of the whole quantity of ice is then stored, in specified houses, and 75 cents per ton additional as the ice is delivered, until the amount advanced is exhausted by shipments, and thereafter pay $1.60 a ton as shipped. It also provides that the ice shall become the defendant's property when cut. If the contract contained nothing more it should receive the construction adopted by the circuit court. The plaintiff in such case would be required to cut and store the entire quantity of ice named. But it contains the following additional paragraph:

"Provided, however, the said Fred. S. Fisher shall have a right to make up the quantity to be delivered as aforesaid by purchase or otherwise, indemnifying the said Newark Ice Co. for any additional expense it may be put to."

This language was intended to, and does, qualify the preceding terms respecting storage; otherwise it has no significance whatever. It was not intended to relieve the plaintiff from *cutting,* with his own hands or those of his employes; he needed no such relief. He had a right without this provision to avail himself of anybody's cutting. The defendant was only interested in his procurement of the ice and storing it. He needed relief, however, against the obligation imposed by the preceding language to *store the entire quantity.* The defendant was interested in the storage of the three-quarters, named, which was necessary to secure his advances; but no further. This quantity was required to be stored in March, before the last advancement should be made. To require the plaintiff to store (in his own houses) such part of the balance as he should purchase (stored already elsewhere) would subject him to heavy and unnecessary expense; and it was relief against this which the proviso was intended to afford. The stipulation that he "shall bear any additional expense" to the defendant arising from such purchase, seems to remove all doubt of this. It is such "additional expense" as the defendant may incur in taking the ice from other houses, that is contemplated. If the ice was stored in the plaintiff's houses his purchasing could not entail any additional expense on the defendant. The scheme in the minds of the parties seems plain. It was for a sale and purchase of 15,000 tons of ice, on which $7,500 should be advanced. It was important the purchaser should be secured for this sum; and hence the provision for storing three-fourths of the quantity, and a lien upon it for the one-third of the price paid. It was no doubt understood from the beginning that a chattel mortgage on the ice stored should be executed and recorded, as was done when the last advancement was made. The provision for a transfer of title as soon as it was cut afforded no security; and the storage of an additional quantity subsequently to the mortgage would not have increased the security which that instrument afforded. That the plaintiff was not required

or expected to store more than three-fourths by the last of March is made clear by the language referred to. Whether ice of the specified quality (12 inches thick) could be cut after that date is not shown; but we think it is safe to assume that it could not. The parties foreseeing that the plaintiff might not succeed in storing the full amount while the season for cutting lasted, added the proviso for his protection.

The construction stated accords, therefore, not only with the terms of the contract, but with what seems to have been the intention of the parties.

With this construction it becomes necessary to ascertain whether the plaintiff was ready to perform. Nothing shown relieved him from the burden of proving such readiness. He loaded all the vessels forwarded. The tender of certain cargoes afloat, on payment of freight, is unimportant. It appears, however, that he had 4,000 tons on hand. It is immaterial that another was interested in this; he had entire control of it. The refusal to take it excused him from making further provision to deliver. The evidence shows, however, that he could have complied with his contract, and was ready and anxious to do so. The only question open, therefore, is that of damages. The plaintiff is not entitled to the balance of purchase money; but only to such sum as will cover his loss—in other words, the profit he would have made if the ice had been taken and paid for according to the contract. This may be ascertained by deducting from the unpaid purchase money the value of the undelivered ice in the market (in Canada) at the time it should have been taken, and the expenses of loading, etc., saved to the plaintiff by the failure to take it.

The case must go back to the circuit court for the purpose of ascertaining the damages, and entering judgment against the defendant therefor.

---

After the above opinion was handed down, and an order entered in accordance therewith, the defendant in error moved to amend the reversing order by striking out therefrom so much thereof as directs as follows:

"And it is further ordered that this cause be remanded to the said circuit court for the purpose of ascertaining the damages in accordance with the opinion filed, and entering judgment against the defendant therefor."

At the same time the defendant in error moved for leave to file a petition for a rehearing of the cause so far as the same relates to or is covered by the said portion of the said order of reversal.

John R. Emery, of counsel for defendant in error, in support of the motion.

The defendant in error assigns the following reasons for said motion:

"First. Because on the said writ of error and on the opinion of the court the only proper judgment is a judgment of reversal and a direction for a new trial. The order is made as if the cause were heard on an appeal in equity, and not a writ of error.

"Second. Because the said court, sitting as a court of review on a writ of error, has no power or jurisdiction to decide any questions of fact or to direct that any questions of fact shall be considered as settled or determined for the purpose of directing the judgment of the court below upon a reversal of the judgment and order for new trial.

"Third. Because the order of reversal as made deprives the defendant in error of the right of review on the exceptions taken by it during the trial, and which it has the right to have reviewed in case, on a new trial, judgment should be entered against it.

"Fourth. Because such order of reversal shall deprive the defendant in error of defenses which it is entitled to raise upon a new trial.

"Fifth. Because in right and justice the said cause should be retried by the court below upon evidence to be produced on such new trial.

"Sixth. Because, for other reasons, the said amendment should be made."

## Roger Foster, of counsel for plaintiff in error, in opposition.

The court had power to enter the order in the form that it adopted. Such a form is authorized by section 701 of the Revised Statutes, which provides as follows: "The supreme court may affirm, modify or reverse any judgment, decree or order of a circuit court, or district court acting as a circuit court, or of a district court in prize causes, lawfully brought before it for review, or may direct such judgment, decree, or order to be rendered, or such further proceedings to be had by the inferior court, as the justice of the case may require. The supreme court shall not issue execution in a cause removed before it from such courts, but shall send a special mandate to the inferior court to award execution thereupon." The same power is given to the circuit courts of appeals by section 11 of the Evarts act. The object of Rev. St. U. S. § 649, and of the stipulation providing that the court "shall make special findings upon the facts herein," would be nullified were a new trial to be ordered, upon which entirely different findings upon the facts might be made. A similar course has been frequently adopted by the supreme court of the United States. In Railway Co. v. Hoyt, 149 U. S. 1, 17 [13 Sup. Ct. 779], the case was also tried by a court without a jury, which made special findings. The opinion concludes as follows: "The conclusion of this court is that the judgment awarded the lessees is erroneous, and must be reversed, with costs, and that the cause should be remanded, with directions to the court below to enter judgment in favor of the plaintiff in error for the above amount of rent due it, with interest thereon from October 1, 1889, the date of judgment below, and it is accordingly so ordered." In Insurance Co. v. Boykin, 12 Wall. 433, where a general verdict had been rendered below against all the defendants, the court reversed the judgment, and directed that the damages be divided between the different defendants. The supreme court said, speaking through Mr. Justice Miller: "Indeed, it was for a long time denied that a court of error could award a venire facias de novo. In the case of Philips v. Bury, reported at great length in Skin. 447, which was an action in the king's bench and writ of error to the peers, who reversed the judgment below, the case was carried back and forward several times between the peers and the king's bench on the question of which court should render the judgment on the verdict, and it was finally settled that the house of lords should give the judgment which the king's bench ought to have given, Eyre, C. J., saying that, where judgment is upon a verdict, if they reverse a judgment, they ought to give the same judgment that ought to have been given at first, and that judgment ought to be sent to the court below. So in Slocomb's Case, Cro. Car. 442, on a general verdict, where judgment was reversed in the king's bench, it was, in the language of the reporter, 'agreed by all the court, if the declaration and verdict be good, then judgment ought to be given for plaintiff, whereof Jones at first doubted, but at last agreed thereto, for we are to give such judgment as they ought to have given there.' In 1 Salk. (Anon., 1 Salk. 401. See, also, Butcher v. Porter, 1 Show. 400) it is said: 'If judgment be below for plaintiff, and error is brought, and that judgment reversed, yet, if the record will warrant it, the court ought to give a new judgment for the plaintiff,'—which is precisely the case before us. See also, Butcher v. Porter, Id. And in Mellor v. Moore, 1 Bos. & P. 30, on the authority of these and other cases, the court

of exchequer chamber held that, when a judgment is reversed on demurrer in favor of plaintiff, the case is sent down, and a writ of inquiry goes; but when it is upon a verdict they should give the same judgment that ought to have been given at first, and that judgment ought to be sent below. In Gildart v. Gladstone, 12 East, 668, on a case from the common pleas having been reversed on a special verdict, Lord Ellenborough said: 'The court are bound, ex officio, to give a perfect judgment upon the record before him.' The provisions of our statute of 1789, already cited, show that the lawyers who framed it were familiar with the doubts which seemed at that time to beset the courts in England as to the precise judgment to be rendered in a court of errors on reversing a judgment, and they in plain language prescribed the rule which has since become the settled law of the English courts on the same subjects." In Bank v. Smith, 11 Wheat. 171, 172, 182, where a demurrer to the evidence had been sustained, and judgment below entered for the defendant, the supreme court, on a reversal, ordered that judgment be entered for the plaintiff for the damages that were due him, saying: "We are accordingly of opinion that the evidence was sufficient to entitle the plaintiffs to recover; that the judgment of the court below must be reversed, and the cause sent back, with directions to enter judgment for the plaintiffs upon the demurrer to evidence for the amount of the note and interest." In Insurance Co. v. Piaggio, 16 Wall. 378, where judgment had been rendered for the plaintiff, the court, on writ of error, instead of granting a new venire, modified the judgment by disallowing a certain amount of damages therein included, and directing that the court below enter judgment for a less amount with interest. The practice adopted by the court in this case is in accordance with the former practice in the house of lords and the exchequer chamber, which were accustomed, when reversing a judgment in favor of the defendant in a case like that at bar, to direct a writ of inquiry as to the damages to be issued by the court below.

The special findings here are to be treated as a special verdict. Rev. St. U. S. § 649.

2 Tidd, Pr. p. 1180: "When a judgment against the plaintiff is reversed on a writ of error brought in the king's bench, that court, having the record before them, may in all cases give such judgment as the court below should have given; and, if necessary, may award a writ of inquiry to assess the damages. And so, when judgment is given against the plaintiff in the king's bench on a special verdict, by which the damages are assessed,—as where judgment is given on demurrer,—the exchequer chamber or house of lords, * * * not having the record before them, but only a transcript, cannot give a new and complete judgment, but only an interlocutory judgment quod recuperet; and, the transcript being remitted, the court of king's bench will award a writ of inquiry, and give final judgment." Citing Philips v. Berry, 1 Ld. Raym. 5, 10, 1 Salk. 403, 1 Skin. 447, Carth. 319; Denn v. Moore, 1 Bos. & P. 30; Faldowe v. Ridge, Cro. Jac. 206. See, also, Stephens v. Cowan, 6 Watts, 511, 513, 514.

2 Tidd, Pr. p. 1179: "If judgment be given against the defendant, and he bring a writ of error upon which the judgment is reversed, the judgment, it is said, shall only be quod judicium reversetur; for the writ of error is brought only to be eased and discharged from that judgment. But, if judgment be given against the plaintiff, and he bring a writ of error, the judgment shall not only be reversed, if erroneous, but the court shall also give such judgment as the court below should have given, for the writ of error is to revive the first cause of action, and to recover what he ought to have recovered by the first suit, wherein an erroneous judgment was given."

## The motion was denied without any opinion being filed.