## CHICAGO, MILWAUKEE AND ST. PAUL RAILWAY COMPANY v. HOYT.

### ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

No. 180.   Argued March 30, 1893. — Decided April 17, 1893.

When the record contains special findings of fact, but no bill of exceptions, the errors of law relied upon by a plaintiff in error must be considered and determined upon the findings.

If a contracting party absolutely binds himself to perform things which subsequently become impossible of performance, or to pay damages for the nonperformance thereof, and the thing which causes the impossibility might have been foreseen and guarded against in the contract, or arose from the act or default of the promisor, he will be held to the strict performance of his contract; but if the cause of the impossibility be of such a character that it cannot reasonably be supposed to have been in the contemplation of the contracting parties when the contract was made, he will not be held bound by general words, which, though large enough to include it, were not used with reference to the possibility of the particular contingency which afterwards happened.

A railway company and several individuals entered into a contract for the construction of a grain-elevator by the latter, wherein the company agreed "that the total amount of grain received at said elevators shall be at least five million bushels on an average for each year during the term of this lease; and in case it shall fall short of that amount the said party

of the first part agrees to pay to the said party of the second part one cent per bushel on the amount of such deficiency, settlements to be made ·at the close of each year; and whenever it shall appear at the close of any year that the total of grain received during so much of the term of this lease as shall then have elapsed does not amount to an average of five million bushels for each year, the party of the first part shall pay to the parties of the second part one cent per bushel for the amount of such deficiency; but, in case it shall afterwards appear that the total amount received up to that time equals or exceeds the average amount of five million bushels per annum, the amount so paid to the party of the second part shall be refunded or so much thereof as the receipts of the year shall have exceeded five million bushels, so that the whole amount paid on account of deficiency shall be refunded, should the total receipts for the entire term equal or exceed fifty million bushels in all, or an average of five million bushels for each year." *Held*, that the railway company only agreed that the quantity of grain which it would deliver at the elevators or tracks connected therewith, in the usual way in cars, for storage and handling, should amount on an average to at least 5,000,000 bushels per annum for a period of ten years, and that, in case the grain so delivered, or brought to the elevators for delivery, fell short of that quantity, it would pay one cent per bushel on the amount of such deficiency.

THE case is stated in the opinion.

*Mr. Edwin Walker*, (with whom was *Mr. John W. Cary* on the brief,) for plaintiff in error.

*Mr. John N. Jewett* for defendants in error.

MR. JUSTICE JACKSON delivered the opinion of the court.

This action was brought by defendants in error against the plaintiff in error to recover a designated sum of money alleged to be due under the terms of a covenant contained in a certain indenture of lease made and entered into between the parties. The cause was tried by the court below under a written stipulation of the parties waiving a jury, and resulted in a judgment for the plaintiffs below for the sum of $33,783.83, to reverse which, for errors of law claimed to have been committed by the court in its construction of the covenant and in the legal conclusions it reached from the facts specially found, this writ of error is prosecuted.

On February 18, 1880, the Chicago, Milwaukee and St. Paul Railway Company, (hereafter called the railway company,) being the owner thereof, leased and demised to the defendants in error lots 3, 4 and 5, of block K, of the original town of Chicago, for a term of ten years from the first day of January, 1881, at an annual rental of $3850, to be paid quarterly by the lessees, who were also to pay all taxes and assessments that might be levied upon the premises during the term.  At the date of the lease the lessees were the owners of the adjoining lots 1 and 2 of the same block, upon which was located an elevator or warehouse, used for receiving, storing and handling grain, and having a capacity for about 350,000 bushels.  The lease was executed under seal of the respective parties thereto, and the material provisions thereof, so far as they relate to the present controversy, are as follows:

By the second article, Hoyt and his associates agreed to erect on said lots 3, 4 and 5 a grain elevator "of a storage capacity of 700,000 bushels or more during the year 1880."  The article provided that the elevator should have all modern improvements and should be constructed to the satisfaction of the railway company.  No question is raised upon this article.  The case admits that it was fully executed.

By the third article, the railway company "agrees to lay all necessary tracks adjacent to said elevator, to connect its railway therewith for the purpose of delivering grain in cars thereto, and keep the same in repair during the time of this lease, and agrees to deliver on said tracks in cars, at said elevator, to the parties of the second part, all the grain that may be brought by its railway consigned to parties in the city of Chicago, so far as the party of the first part can legally control the same, for handling and storage in said elevator."  The case involves no breach of this article.

By the fourth article it is provided as follows: "The said parties of the second part [Hoyt and his associates] agree to receive, handle and store said grain as delivered in the usual manner of handling grain in the city of Chicago to the extent and capacity of said elevator to be constructed, and in addition agree that they will use for the same purpose, so far as their

other engagements will allow, the elevator now standing on lots 1 and 2 of said block, and the said party of the first part shall at all times be entitled to storage for its grain to the extent of at least 1,000,000 bushels. The parties of the second part, with the consent of the party of the first part, may receive grain for storage from other parties and from river and canal craft, but in case such grain is so received so as to reduce the capacity of the parties of the second part to accommodate the party of the first part to the extent of 1,000,000 bushels in said elevators, the said parties of the second part agree to furnish storage in other elevators to the party of the first part to the extent that their capacity is so reduced, without expense to the said party of the first part for switching or otherwise." The case involves no violation of this article by either of the parties.

The fifth, sixth and seventh articles, taking them in their order, relate, 1st, to the charges to be made for the storage and handling of grain — certain elevators accommodating the grain business of competing railways being referred to as a standard; 2d, to the rebuilding of the elevator in case of its destruction by fire or other casualty, and that the "parties of the second part will save the said party of the first part free and harmless from all loss or damage by fire to said elevator or contents during the continuance of this lease"; and, 3d, to the weighing of the grain received into the elevator, and the appointment of weighers. In all these respects the case presents no question of controversy.

The last clause of the seventh article reads as follows: "It is further agreed that the parties of the second part will, at all times, keep a force at said elevators sufficient to transact all business that may be offered by said party of the first part, and that cars of grain will be received and unloaded, when the business of the party of the first part requires it, in the night time or on Sundays, and that said business shall be dispatched with equal and as great facility in that respect as at any of the elevators in the city of Chicago above mentioned, so as not to delay the cars of the party of the first part unreasonably or unnecessarily."

It is upon the alleged breach of the eighth article of the contract that this suit is brought. That article reads as follows:

" In consideration of the agreement aforesaid the said party of the first part agrees that the total amount of grain received at said elevator shall be at least five million bushels on an average for each year during the term of this lease; and in case it shall fall short of that amount the said party of the first part agrees to pay to the said parties of the second part one cent per bushel on the amount of such deficiency, settlements to be made at the close of each year; and whenever it shall appear at the close of any year that the total grain received during so much of this lease as shall then have elapsed does not amount to an average of five million bushels for each year, the party of the first part shall pay to the parties of the second part one cent per bushel for the amount of such deficiency; but in case it shall afterwards appear that the total amount received up to that time equals or exceeds the average amount of five million bushels per annum, the amount so paid to the parties of the second part shall be refunded or so much thereof as the receipts of the year shall have exceeded five million bushels, so that the whole amount paid on account of deficiency shall be refunded should the total receipts for the entire term equal or exceed fifty million bushels in all on an average of five million bushels for each year."

The remaining articles of the contract, including the supplement thereto, are comparatively unimportant.

In May, 1888, the defendants in error brought their action of covenant against the railway company in the Superior Court of Cook County, Illinois, for the alleged breach of the contract and agreement embodied in said article 8 of the lease. The railway company, being a citizen of Wisconsin, removed the cause to the United States Circuit Court for the Northern District of Illinois. The declaration contained two special counts, and the same breaches are assigned in each count. In the first count the contract is set out *in hæc verba;* the second, according to its tenor and effect.

The first breach assigned was that the grain received for

storage from the railway company during the year 1886 was less by 1,740,194 bushels than the 5,000,000 bushels covenanted to be received, and, therefore, the railway company became bound at the close of the year 1886 to pay the plaintiffs, (defendants in error,) on account of the deficiency, the sum of $17,401.94.

The second breach averred that the grain received for storage from the railway company during the year 1887 was less by 2,042,408 bushels than the 5,000,000 bushels covenanted to be received, and, therefore, the railway company became liable at the close of the year 1887 to pay to the plaintiffs, (defendants in error,) on account of the deficiency, the sum of $20,424.08.

The main breach specially set up and relied on is the third, which comprehends the other two, and is thus stated in the declaration:

"The said plaintiffs further aver that the total amount of grain received in the elevators mentioned in said indenture during the years 1886 and 1887 did not equal the ten million bushels or five million bushels upon an average for each of said years covenanted by the defendant in said indenture to be therein received during those years, but, on the contrary, the said plaintiffs aver that the total amount of grain received in said elevators during said two years, allowing to the defendants the full storage capacity in said elevators of one million bushels stipulated for in said indenture, was less than the ten million bushels promised to be therein received by the defendant as aforesaid during said years 1886 and 1887 by three million seven hundred and eighty-two thousand six hundred and two (3,782,602) bushels, and the plaintiffs aver that on account of said deficiency between the amount of grain promised by the defendant to be received in said elevators and the amount actually received therein during said years the said defendant became and was liable to pay to the plaintiffs, according to the terms and provisions of said indenture of lease and agreement and its further covenant in such case therein provided, the sum of one cent per bushel upon the total number of bushels constituting the deficiency of said years 1886 and 1887, whereby and by reason whereof the said defendant,

by virtue of its covenant aforesaid, became liable to pay to said plaintiffs thirty-seven thousand eight hundred and twenty-six dollars and two cents ($37,826.02) at the times and in the manner in said indenture provided."

On demurrer of the defendant to the declaration being overruled by the court, 39 Fed. Rep. 416, so far as it related to the breaches thus charged, the defendant interposed a plea of general performance, and by stipulation of the parties it was agreed that "said cause shall stand for trial upon the single plea of general performance, first pleaded by said defendant, and the issue made thereon, with the right reserved to either party to introduce on the trial of said cause under said issue all evidence which could be properly introduced under any issue legitimately framed under special pleas applicable to the case, and that upon the filing of this stipulation all other pleas filed herein by the said defendant shall be considered as withdrawn."

The cause was thereupon submitted and heard upon its merits by the court below, which made the following special findings of fact:

" First. It found the contract as already recited, duly made and entered into between the parties.

" Second. That said elevator was constructed upon the lots named in said agreement and was completed within the time and in accordance with the terms and conditions of said agreement, on or about the 24th day of December, A.D. 1880, with a working capacity of 750,000 bushels; that the storage or working capacity of the elevator known as the Fulton elevator was 350,000 bushels, both elevators affording storage and working capacity of about 1,100,000 bushels of grain, and that the cost of constructing said new elevator was about the sum of $200,000.

" Third. That the said Munger, Wheeler & Company, as assignees of Jesse Hoyt and his associates, built said new elevator and have controlled and operated both elevators since December, 1880, and are now operating the same, and that said firm during said time also owned and controlled six other elevators, all located in the city of Chicago, upon other

railroads entering into said city, and that at the present time said firm controls and operates in all eight grain elevators in said city, with an aggregate storage or working capacity of about 6,000,000 bushels of grain.

"Fourth. That in the year 1886 the plaintiffs received from the defendant, for store in the St. Paul or new elevator, 1,923,339 bushels of grain, and in the Fulton elevator 903,482 bushels, and also that the plaintiffs received from the defendant for storage 432,985 bushels of grain in the Union elevator, located on the Chicago and Alton Railroad, in the city of Chicago, making a total for the year 1886 of grain received by the plaintiffs from the defendant of 3,259,806 bushels, all of which is credited to the defendant in its account for that year.

"That in the year 1887 the plaintiffs received from the defendant in the new or St. Paul elevator 2,300,292 bushels of grain, and in the Fulton elevator 657,300 bushels of grain, making a total of 2,957,592 bushels of grain received by the plaintiffs from the defendant during the year 1887.

"That all the grain received and handled by the plaintiffs in the Fulton and St. Paul elevators during said years was received from the Chicago, Milwaukee and St. Paul Railway Company.

"Fifth. The court further finds that the plaintiffs admitted in open court that during the years 1886 and 1887 grain was tendered by the defendant to the plaintiffs for storage, and that it could not be received for the reason that the plaintiffs' warehouses were filled; that the grain so tendered amounted to 8,685,269 bushels, and that the plaintiffs never declined to receive shipments of grain from the defendant when such elevators had capacity to receive it within 1,000,000 bushels, and that when the plaintiffs refused to receive further grain for storage the defendant was notified that it occupied the entire capacity stipulated for in the contract at the time plaintiffs declined to receive the grain so tendered, to wit, 1,000,000 bushels.

"Sixth. That for the year 1886 the defendant paid for switching grain to other elevators when the plaintiffs were

unable, and, therefore, refused to accept the same, the sum of $2871.00, and in the year 1887 the sum of $9962.35, and that the cost of train service for the defendant in delivering such grain to other elevators amounted to about the same sum.

"That the defendant also, during said year, contracted with parties having grain stored in said elevators to remove the same in order to furnish more room for the defendant; that for the removal of 100,000 bushels the defendant paid the owners thereof $15,000.00, and that after such removal the plaintiffs refused to receive from the defendant for storage more than 40,000 bushels in place of the grain that had been so removed for the reason that that amount of additional grain exhausted the storage and hauling capacity of said two elevators; that it was to the interest of the defendant to deliver all the grain to the plaintiffs at said St. Paul and Fulton elevators during said years.

"That during the two years in controversy the entire storage capacity of said elevators was constantly occupied by grain received from the defendant's cars, and, although the plaintiffs refused to receive additional grain tendered by the defendant during the same period, their refusal was always based upon the ground that their elevators were full and contained more than 1,000,000 bushels of grain received from the defendant.

"That at no time during the said years 1886 and 1887 did the plaintiffs refuse to receive grain from the defendant for storage in said elevators when there was any unoccupied storage space in the same, and that some of the grain so delivered and stored during said years remained in said elevators so long that the plaintiffs were not able to receive or handle for defendant during said years the amount of grain contemplated by the contract or the full amount actually tendered by the defendant, and that but for this unusual condition the plaintiffs would have received and stored all the grain tendered by the defendant.

"Seventh. The court further finds that the plaintiffs' regular charges for storage of grain in said elevators during the years 1886 and 1887 were one and three-quarters of a cent

per bushel for the first ten days and one and one-half of a cent per bushel for the subsequent ten days, and for every thirty days the storage charges were one cent and three-quarters per bushel; that for 1,000,000 bushels stored in such elevators and continued therein for one year, the regular storage charges for the same during the years 1886 and 1887 would be at the rate of $150,000 for each 1,000,000 bushels for the term of one year; that if said elevators could be kept employed with first storage, that is, if 1,000,000 bushels could pass through said elevators each ten days, the charges for a year would amount to about $270,000.

"That the length of time that said grain remained in store was not regulated or controlled by either the plaintiffs or defendant, but by the shippers or owners of such grain.

"Eighth. That the plaintiffs have kept the account of all their elevators together, and, therefore, could not state the earnings of the elevators in question for the years 1886 and 1887.

"Ninth. There is no evidence of the amount of earnings of said St. Paul and Fulton elevators during the years 1886 and 1887, or of the income of the plaintiffs derived from the storage of grain or charges thereon in said elevators during said period of time, nor is there any evidence of any actual damages sustained by the plaintiffs by reason of their not handling in said elevators during said years the full amount of 10,000,000 bushels of grain, or by reason of the alleged breach of covenant by the defendant other than the one cent per bushel for the years 1886 and 1887, as prescribed by article 8 of the contract."

As the result of these findings, the amount of the deficiencies for the years 1886 and 1887, with interest from the end of each year to September 25, 1889, was ascertained to be $42,806.13, from which was deducted the rental and interest thereon, for the years 1886 and 1887, set up as a counter-claim, amounting to the sum of $9022.30, which left a balance due from the defendant to the plaintiffs of $33,783.83, for which judgment was rendered.

The defendant moved for judgment on various grounds,

which were denied by the court, and which need not be specially noticed, as they are covered by the assignments of error.

In the view we take of the case it is not necessary to consider several questions presented by the plaintiff in error, such as want of mutuality in the covenant in question, or the impossibility of the performance thereof, or that it was a wagering contract, and *ultra vires* on the part of the railway company. The material questions of the case are covered by the two assignments that the judgment is not sustained by the special findings of fact, and that the court erred in its construction of the contract between the parties. There is no bill of exceptions in the record, and the errors of law relied upon by the plaintiff in error must therefore be considered and determined upon the special findings of fact.

The action of the lower court in overruling the demurrer to the declaration proceeded in part, if not entirely, upon the ground that the undertaking entered into by the railway company in and by the eighth article of the lease amounted to a guaranty that the business of the elevators during each year of the term should amount to a certain sum. As we understand their position, counsel for the defendants in error do not, however, insist upon this construction of the covenant, but rely upon the interpretation given it by the Circuit Judge at the hearing on the merits, which was "that if, with a storage capacity of 1,000,000 bushels, the plaintiffs should not be able to receive and handle 5,000,000 bushels annually; and earn commissions on that basis, the defendant would pay to the plaintiffs one cent per bushel on the deficiency."

If the true meaning and intent of the covenant, read, as it should be, in connection with the other provisions of the contract, and in the light of the surrounding circumstances, the situation of the parties, and the objects they respectively had in view, was to guarantee to the lessees that they would actually receive, store and handle at the designated elevators, on an average each year of the lease, as much as 5,000,000 bushels of grain, and that if in the course of the grain business they could not, in fact, receive, store and handle more than

1,000,000 bushels during the year, still the railway company would be liable to them for one cent on 4,000,000 bushels not so received and stored, although tendered and offered to them in the manner and at the place provided for in the contract, then there is no error in the judgment of the Circuit Court.

If, however, the language of the stipulation means, as counsel for plaintiff in error contend, that the railway company only agreed that the quantity of grain which it would deliver at the elevators or tracks connected therewith, in the usual way in cars, for storage and handling, should amount on an average to at least 5,000,000 bushels per annum for a period of ten years, and that in case the grain so delivered, or brought to the elevators for delivery, fell short of that quantity, it would pay one cent per bushel on the amount of such deficiency, then the judgment is erroneous, and should be reversed. We are of opinion that the latter construction is the proper one, and meets the real object and purpose which the parties had in view in entering into the contract.

To meet a natural and reasonable solicitude of the lessees that the full supply of grain should be brought to their elevators, the railway company agreed " to deliver on said tracks in cars, at said elevators, to the parties of the second part (the lessees) all the grain that may be brought by its railway consigned to parties in the city of Chicago, so far as the party of the first part (the railway company) could legally control the same, for handling and storing in said elevator." If the railway company had failed to deliver at the elevators for storage and handling all grain, consigned or unconsigned, which it brought to Chicago, and could legally control, it might perhaps have been liable to the lessees for the damage thence resulting, and could not have set up, by way of excuse or defence, that the elevators were continuously filled with other grain previously received from the railway company. The fact that the lessees had furnished storage for a million bushels received from the railway company, and thereby exhausted the capacity of their elevators to take any more grain on storage so long as the million bushels remained on hand, would not have exempted the railway company from the obli-

gation of delivering at the elevators all grain brought by it to the city, so far as it could control the same. Under this provision of the contract if the quantity brought, and subject to its control, was four or five million bushels in addition to the million previously delivered and in store, the railway company would still be bound to tender such additional grain to the lessees, who, under the construction placed upon the eighth article of the lease by the court below, could not only decline to accept the same, but actually make their inability to receive and store the grain tendered the basis of a valid claim for one cent per bushel on the amount so tendered and declined. A result so unreasonable as this is hardly to be supposed to have been contemplated and intended by the parties. It is found as a fact that the length of time grain could or would remain in store was not, and could not, be legally controlled by either the lessor or the lessees, but was subject to the exclusive control, in that regard, of the shippers and owners of the grain. The construction which was placed upon the contract, and which is necessary to support the judgment below, would place the railway company in the position of undertaking to guarantee that shippers and owners having grain on storage in the elevators would so deal with, or remove and dispose of the same as to enable the lessees to store and handle more grain than the elevators had capacity for. It is not to be supposed that the railway company was undertaking to make a guaranty as to how grain, owned and stored by others, would be dealt with or controlled in respect to its remaining or being removed from the elevators, and the language of the covenant does not require a construction which would place the railway company in that position.

The court below attached importance to the use of the word "received," as employed in the eighth article. The words "total amount of grain received *at* said elevator" would, however, be pressed beyond their legitimate and proper meaning if construed to mean that the elevator should actually store and handle 5,000,000 bushels during each year without regard to its capacity, or without reference to the ability of the lessees to accept and store that quantity. The language of

the covenant is that the "total amount of grain received at said elevators shall be at least 5,000,000 bushels on an average for each year during the term of this lease, and in case it shall fall short of that amount, the said party of the first part agrees to pay to the said party of the second part one cent per bushel on the amount of such deficiency."

The agreement or stipulation that the amount of grain "received *at* said elevator" should reach the designated quantity, falls short of an undertaking or guaranty by the railway company, that the elevator should, in fact, store and handle that quantity each year of the term. The amount of grain "received at" an elevator during a given period should not be construed as meaning that such amount would or should be actually taken into the same for storage and handling, unless there is something in the context clearly indicative of an intention to use the words in the latter sense. No such intent appears in the present case.

The manifest object and purpose of the covenant was to assure the lessees that there would be delivered at or brought to said elevators by the railway company and others a total amount of at least 5,000,000 bushels of grain per annum for storage and handling, and not that the railway company would guarantee that the lessees could or would actually receive, store and handle that quantity at the elevators. When, therefore, the railway company, and others, offered at the elevators the stipulated quantity or amount of grain, it performed the condition of its guaranty, and the inability of the lessees to accept the grain so tendered, on account of the storage capacity of the elevators being fully occupied by third parties, whose action in respect to allowing the grain to remain, or to be removed, was beyond the control of either the lessor or the lessees, cannot operate to defeat such performance or constitute any ground for thereafter holding the railway company liable on its guaranty.

There can be no question that a party may by an absolute contract bind himself or itself to perform things which subsequently become impossible, or pay damages for the non-performance, and such construction is to be put upon an

unqualified undertaking, where the event which causes the impossibility might have been anticipated and guarded against in the contract, or where the impossibility arises from the act or default of the promisor. But where the event is of such a character that it cannot be reasonably supposed to have been in the contemplation of the contracting parties when the contract was made, they will not be held bound by general words, which, though large enough to include, were not used with reference to the possibility of the particular contingency which afterwards happens.

This principle is directly applicable here, for the covenant sued on cannot be construed to mean that the railway company contemplated by the terms of its agreement that it was to be held responsible for the course of business of the lessees, or that it was undertaking to guarantee that shippers and owners, having grain in store at the elevators, would remove the same with sufficient dispatch to enable the elevators to store and handle as much as 5,000,000 bushels annually. This would be a most unusual and unreasonable undertaking, wholly beyond the control and ability of the railway company to perform, and while the words "receive at the elevators" might in and of themselves be broad enough to include such an undertaking, if the context clearly showed that such was the intention of the contracting parties, we are of opinion that they were not so understood and used by the parties in this case, and should not be so extended as to cover the contingency or possibility of such a course of dealing as would prevent the acceptance of grain if the agreed quantity was tendered. There is no allegation in the declaration that grain to the amount specified was not, during the years 1886 and 1887, received at or tendered in cars on the tracks at said elevators for delivery, to the amount of or in excess of 5,000,000 bushels of grain. On the contrary, the court below finds, as a matter of fact, that the defendant in 1886 and 1887 so delivered 6,210,398 bushels, which was received by the defendant into said elevator, and further finds as follows: "Fifth. The court further finds that the plaintiffs admitted in open court that during the years 1886 and 1887

grain was tendered by the defendant to the plaintiffs for storage, and that it could not be received for the reason that the plaintiffs' warehouses were filled; that the grain so tendered amounted to 8,685,269 bushels, and that the plaintiffs never declined to receive shipments of grain from the defendant when such elevators had the capacity to receive it within a million bushels, and that when the plaintiffs refused to receive further grain for storage the defendant was notified that it occupied the entire capacity stipulated for it in the contract at the time plaintiffs declined to receive the grain so tendered, to wit, one million bushels."

It is urged in behalf of the defendants in error that this amount of 8,685,269 bushels so tendered by the railway company includes the 6,210,398 bushels which the court finds was actually received into the said elevators during said years. We do not so construe this finding. Its language relates clearly and distinctly to an amount of grain that was tendered by the railway company, and which could not be received by the lessees, for the reason that the warehouses were filled. It is thus shown that, in addition to what was actually received, there was tendered by the railway company, at the place and in the manner provided for in the contract, 8,685,269 bushels, which the elevators could not accept and did not receive and store. The amount so tendered, with that actually received, exceeded the total amount which the railway company agreed that the lessees should have the opportunity to accept and store, and this we hold to be a full and complete compliance by the railway company with the terms and true meaning of its covenant. To hold otherwise would render the railway company liable for the inability of the lessees to accept the performance that was offered by it. It would require the clearest and most unqualified understanding on the part of the railway company to subject it to such a liability.

The plaintiff in error interposed a counter-claim for the rent due it for the years 1886 and 1887, which, as found by the court below, amounted to $9022.30, which was deducted from the amount which the court below adjudged to be due the lessees.

*The conclusion of this court is that the judgment awarded the lessees is erroneous, and must be reversed with costs, and that the cause should be remanded with directions to the court below to enter judgment in favor of the plaintiff in error for the above amount of rent due to it, with interest thereon from October 1, 1889, the date of judgment below, and it is accordingly so ordered.*

The CHIEF JUSTICE having been of counsel, and MR. JUSTICE FIELD not having heard the argument, took no part in the consideration or decision of this case.