BUFFALO & L. LAND CO. v. BELLEVUE LAND & IMPROVEMENT CO.

(Supreme Court, Special Term, Erie County.   November 11, 1897.)

SPECIFIC PERFORMANCE—CONTRACT TO OPERATE STREET RAILROAD.

A company owning a tract of land near a city agreed with another company, formed to purchase it, to construct and operate an electric street railroad over said land, connected with the street railroad of said city, and operate its cars "as often as once every half hour from 7 a. m. to 8 p. m. of each day, as such street railroads are usually run," and that on failure to do so it would restore the purchaser to the position occupied by it when the contract was made, and pay $5,000 as liquidated damages. *Held*, that the vendee was entitled to a specific performance of said alternative covenant where the vendor performed its covenants except that during one winter, when there were unusually heavy snows, accompanied by high winds, blockading the road, no cars were run over the line for some days, though the vendor did not willfully neglect its duties under the contract.

Action by the Buffalo & Lancaster Land Company against the Bellevue Land & Improvement Company for specific performance. Decree for plaintiff.

Charles E. Woodbridge and Simon Fleischmann, for plaintiff.

Charles Daniels, John E. Selkirk, and John G. Milburn, for defendant.

WOODWARD, J.   This action was brought for the purpose of compelling the defendant to a specific performance of the alternative covenants of a contract, upon the ground that the party was in default in that it had failed to perform certain specific covenants going to the essence of the contract.   It was tried in connection with four other actions brought by the defendant against the plaintiff for the foreclosure of a certain mortgage, the real question at issue being the same in each case.   It was established on the trial that the Bellevue Land & Improvement Company was in 1892 the owner of a considerable tract of land situate about half way between the village of Lancaster and the city of Buffalo, both in the county of Erie, and about five miles distant from either place, and south of the village of Depew.   On the 1st day of June, 1892, the Bellevue Land & Improvement Company entered into a contract in writing with Charles L. Woodbridge, Walter Hanford, Thomas Christie, Timothy Hogan & Sons, Cassine G. Wilson, J. Lester Woodbridge, Eugene Klein, and Frank K. Roberts, agreeing to sell a portion of its land to the parties named for $600 an acre, amounting to $71,136.   It was agreed that a portion of this purchase price should be paid in definite sums at certain specified times, and that the remainder should be secured by a bond and mortgage.   The real estate involved in this transaction was, at the time, farm land, worth, in its then condition, in the neighborhood of $200 per acre.   As an inducement to the purchase of this land at the advanced price, the Bellevue Land & Improvement Company covenanted, among other things, that it would—

"Guaranty that an electric street railroad shall be constructed, maintained, and operated, connecting with the street-railway system of the city of Buffalo, and running thence to the village of Lancaster, and that it shall run in and along said avenue (to be dedicated by the party of the second part [the plaintiff in

47 N.Y.S.—46

this action]) when located, and that the construction of the said road shall be commenced on or before the 1st day of July, 1892, and that the same shall be completed and in operation on or before the 1st day of May, 1893, and that said street railroad shall be maintained in good condition and in operation until said lands shall be sold by said second parties, and that cars shall be run thereon for the conveyance of passengers after its completion as often as once every half hour from 7 a. m. to 8 p. m."

## It was also covenanted that:

"Should said party of the first part fail to cause such street railroad to be constructed, maintained, and operated as hereinbefore provided, it agrees to take back from said party of the second part the lands hereby contracted, provided said land shall be free and clear from all liens and incumbrances except such mortgage and taxes and assessments levied or assessed thereon after this date, and to repay them all moneys which they may have paid on this contract or on the said bond and mortgage, and to discharge said mortgage and to surrender to them said bond; and it further agrees to pay said parties $5,000, which is hereby agreed shall be full liquidated damages for such failure."

On the 1st day of March, 1893, the parties above mentioned having in the meantime been duly incorporated under the name of the Buffalo & Lancaster Land Company, and having paid $15,556 of the purchase money, a new contract, understood to embrace substantially the same conditions, was entered into between the Bellevue Land & Improvement Company, the defendant, and the Buffalo & Lancaster Land Company, plaintiff. This new contract recites that the party of the first part has heretofore entered into a contract with the parties above named—

"Whereby the party of the first part agrees that an electric street railroad shall be constructed and operated over said land as will by reference to said agreement more fully appear; and whereas, the parties to said agreement of the second part have received from the parties of the first part a conveyance of said land, and are about to convey the same to said party of the second part (the Buffalo & Lancaster Land Company): Now, this agreement witnesseth that, in consideration of the premises and the sum of one dollar paid by the party of the second part to the party of the first part, and for other good and valuable considerations, the party of the first part agrees, in case the parties to said agreement of the second part shall make the conveyance hereinbefore recited, that an electric street railroad shall be constructed, maintained, and operated, connected with the street-railroad system of the city of Buffalo, and running thence to the village of Lancaster, and that the said railroad shall be run over said land and in and along a certain street or highway one hundred feet wide, as the same is now located, which street or highway runs in a direction parallel or nearly parallel to the northerly line of said land; that said street railroad shall be completed and in operation on or before the 1st day of May, 1893; that said street railroad shall be maintained in good condition and in operation until the said land shall be sold by the party of the second part; and that, after the completion of said railroad, cars shall be run thereon for the convenience ["conveyance" in the original contract, following the language of the statute] of passengers as often as once every half hour from 7 a. m. to 8 p. m. of each day, as such street railroads are usually run, until said land is sold. The party of the first part further covenants that, in case said street railroad shall not be constructed, maintained, and operated as hereinbefore provided, the said party of the first part will, at the request of the party of the second part, take back the said land, provided the said land shall be free and clear of all liens and incumbrances except a mortgage made by the parties to said agreement of the second part to the party of the first part, to secure the payment of the sum of $55,580.00, which mortgage bears even date herewith, and except, also, taxes and assessments levied or assessed thereon since the 1st day of June, 1892, and except also any incumbrances upon said land, or any defects in the title thereto of the party of the second part which existed

at the time of the delivery of the deed to the parties to said agreement of the second part; and thereupon the party of the first part will repay to the party of the second part all money which has or may be paid to the party of the first part pursuant to the terms of said agreement, and all moneys which may have been paid on said mortgage or the bond to secure which the same is given, and all moneys which may have been paid on account of taxes or assessments levied or assessed upon said premises since the 1st day of June, 1892, and will pay to the party of the second part the further sum of $5,000.00, which it is hereby agreed shall be full liquidated damages for the breach of the foregoing covenant for the construction, maintenance, and operation of said street railroad, and the party of the first part will thereupon, at the request of the party of the second part, discharge said mortgage."

The plaintiff in this action received from the defendant a conveyance of the land in question, dedicating the land for the highway as provided in the original contract, paying upon the contract a sum aggregating $30,572.16, executed and delivered the bond and mortgage, and generally complied in good faith with all the conditions of the contracts. The defendant made the transfer of the property, accepted money at various times, received the bond and mortgage, and constructed, maintained, and operated the street railroad in accordance with the agreement, except that during the winter of 1894–95 unusually heavy snows, accompanied by high winds, blockaded the highway to such an extent that for some days no cars were run over the line involved in this action, though the defendant company, through its employés, exerted itself in the effort to operate the road to an extent which fairly relieves it from any imputation of having willfully neglected its duties under the contract.

The question is, therefore, purely one of law. This court is called upon to decide whether the defendant company, having entered into a covenant with the plaintiff to operate its cars "as often as once every half hour from 7 a. m. to 8 p. m. of each day, as such street railroads are usually run, until said land is sold," can be absolved from that agreement in a court of equity, and be allowed to foreclose its mortgage against the plaintiff, subjecting it to the risks inseparably connected with such a transaction, when prices have suffered a sharp decline, and when the market for large tracts of speculative real estate is concededly inactive. It is substantially agreed on the part of both parties, and it is in accord with the authorities, that both of the contracts involved in this action are but a single transaction; that they are to be construed together; and that the intent of the parties is to be gathered from the reading of each of the instruments in its relation to the other. Thus viewed, there can be no doubt that the defendant company, made up of business men of large experience, did covenant with the plaintiff in this action to construct, maintain, and operate a street railroad over the lands purchased by the plaintiff, and that, in addition to the obligation which such railroad owed to the state to operate its cars in a reasonable manner for the accommodation of the public, the defendant company undertook, without exception, to run its cars "as often as once every half hour from 7 a. m. to 8 p. m. of each day," and the clause, "as such street railroads are usually run," has reference to the equipment, and to such incidental delays as might prevent the operation of its cars upon the exact schedule time, and cannot be construed to modify this express

agreement to run the cars as often as every half hour. In such a case it is no part of the duty of a court of equity to interfere to relieve the defendant from the specific performance of its covenants. "In the first place," says Mr. Justice Story in his Equity Jurisprudence (page 117), "in matters of positive contract and obligation created by the party (for it is different in obligations or duties created by law) it is no ground for the interference of equity that the party has been prevented from fulfilling them by accident, or that he has been in no default, or that he has been prevented by accident from deriving the full benefit of the contract on his own side. Thus, if a lessee on a demise covenants to keep the demised estate in repair, he will be bound in equity, as in law, to do so, notwithstanding any inevitable accident or necessity by which the premises are destroyed or injured; as, if they are burned by lightning, or destroyed by public enemies, or by overwhelming force. The reason is that he might have provided for such contingencies by his contract, if he had so chosen; and the law will presume an intentional general liability where he has made no exception." That the parties to this contract understood the nature of the obligations into which they were entering, and that they were aware of this general rule of law, is evidenced by the numerous exceptions in respect to the covenant to receive back the land contained in the second contract, and which are not to be found in the first agreement. It was important to the purchasers of this property. Indeed, it goes to the very essence of this contract that there should be a street railroad prepared, not only to discharge its obligations to the state, but to afford intending purchasers an opportunity to reach the city of Buffalo at short and regularly stated intervals. This was one of the inducements which the Buffalo & Lancaster Land Company was to hold out to its customers. It was to enter into their contracts with individual purchasers, thus becoming identified with the land, and constituting a part of the property rights of the community which it was hoped to establish upon this purchase. If such a contract cannot be enforced, or, in the event of failure, if the alternative covenant is not to become operative, because of some accident against which the party has not provided, then is there no use of entering into specific agreements. This was, to a certain extent, a speculative contract, entered into by two companies organized for the purpose of dealing in real estate. The value of the land under consideration depended very largely upon the construction and operation of this railroad, with special reference to the degree of comfort, speed, and certainty with which intending purchasers might reach the city of Buffalo, which presumptively afforded the means of a livelihood for the greater part of such community as it was expected would be centered upon this plot. For the purpose of giving this speculative value, and thus to induce the plaintiff company to purchase the property at a large advance upon its value as farm land, the defendant company waived the rights of a street-railroad company under the laws and usages of this state, and specifically covenanted to run its cars "as often as every half hour from 7 a. m. to 8 p. m. of each day," and, failing to do this, it promised to restore the plaintiff to the position which it occupied on the day of entering

into this contract, and to pay the sum of $5,000 as liquidated damages. "Equity," says Mr. Justice Story, "may compel parties to execute their agreements, but it has no authority to make agreements for them, or substitute one for another;" and, the defendant company having deliberately entered into a contract, one of the covenants of which it has failed to keep, there can be no doubt that the plaintiff in this action is entitled to a decree for the specific performance of the alternative covenant. This is neither a new nor novel construction of the law. It is sustained by the highest authorities, both in American and English jurisprudence, as well as by important considerations of public policy. In the case of Dermott v. Jones, 2 Wall. 7, the defendant in error entered into a contract to construct a house on the premises of Miss Dermott, agreeing to build it according to the detailed plans and specifications furnished by Miss Dermott's architect, and to supply all matters requisite for the execution of the work "in all its parts and details, and for the complete finish and fitting for use and occupation all the houses and buildings, and the several apartments of the house and buildings, to be erected pursuant to the plan of the work described and specified in the said schedule; and that the work, and the several parts and parcels thereof, shall be executed, finished, and ready for use and occupation, and be delivered over, so finished and ready," at a day fixed. Jones built the house according to the plans and specifications, except as they were modified by Miss Dermott, but, owing to inherent qualities of the soil, the foundation sank, the building became badly cracked, and consequently dangerous and uninhabitable. Miss Dermott caused the building to be torn down in part and rebuilt upon an artificial foundation, or float, and it thus became a perfect building. Jones having sued Miss Dermott in the federal court for the District of Columbia for the price of the building, her counsel asked the court to charge that she was entitled to "recoup" the amount which it was necessary for her to expend, and this the court refused to do. The case went to the United States supreme court, and Mr. Justice Swayne, delivering the opinion of the court, said:

"The defendant in error insists that all the work he was required to do is set forth in the specifications, and that, having fulfilled his contract in a workmanlike manner, he is not responsible for defects arising from a cause of which he was ignorant, and which he had no agency in producing. Without examining the soundness of this proposition, it is sufficient to say that this is not the state of the case. The specifications and the instrument to which they are affixed constitute the contract. They make a common context, and must be construed together. In that instrument the defendant in error made a covenant. That covenant it was his duty to fulfill, and he was bound to do whatever was necessary to its performance. Against the hardship of the case he might have guarded by a provision in his contract. Not having done so, it is not in the power of this court to relieve him. He did not make that part of the building fit for 'use and occupation.' It could not be occupied with safety to the lives of the inmates. It is a well-settled rule of law that if a party by his contract charge himself with an obligation possible to be performed, he must make it good unless its performance is rendered impossible by act of God, the law, or the other party. Unforeseen difficulties, however great, will not excuse him. Paradine v. Jane, Aleyn, 27; Beale v. Thompson, 3 Bos. & P. 420."

After citing various analogous cases, the court says:

"The principle which controlled the decision of the cases referred to rests upon a solid foundation of reason and justice. It regards the sanctity of contracts. It requires parties to do what they have agreed to do. If unexpected impediments lie in the way, and a loss must ensue, it leaves a loss where the contract places it. If the parties have made no provision for a dispensation, the rule of law gives none. It does not allow a contract fairly made to be annulled, and it does not permit to be interpolated what the parties themselves have not stipulated."

In the case of Beebe v. Johnson, 19 Wend. 500, the plaintiff had deeded to the defendants a certain right to make and vend a machine for threshing grain, agreeing to perfect the patents in England so as to the protect the purchaser in his right to make and sell the machines in the province of Canada. It transpires that the laws of England forbade the granting of such a patent to a citizen of a country other than Great Britain or its provinces, and the plaintiff sued the defendant for the purchase money, contending that, as the laws of England prevented him from securing the English patents, he was not obliged to perform this covenant. The court, in discussing this case, said that:

"If the covenant be within the range of possibility, however absurd or improbable the idea of its execution may be, it will be upheld; as, where one covenants that it shall rain to-morrow, or that the pope shall be at Westminster on a certain day. To bring the case within a rule of a dispensation, it must appear that the thing to be done cannot, by any means, be accomplished; for, if it is only improbable, or out of the power of the obligor, it is not in law deemed impossible. * * * If the party enter into an absolute contract without any qualification or exception, and receives from the party with whom he contracts the consideration of such engagement, he must abide by the contract, and either do the act or pay damages; his liability arising from his own direct and positive undertaking."

In the case of Harmony v. Bingham, 12 N. Y. 107, where the defendants covenanted for a given price to deliver certain freight within a given time, and failed to do so, the court, delivering its opinion through Judge Edwards, said:

"It is a well-settled rule that, where the law creates a duty or charge, and the party is disabled from performing it without any default in himself, and has no remedy over, then the law will excuse him; but where the party, by his own contract, creates a duty or charge upon himself, he is bound to make it good, notwithstanding any accident or delay by inevitable necessity, because he might have provided against it by contract. This rule has been uniformly followed, and that, too, even in cases in which its application has been considered by the court as attended with great hardship. The only exception which has ever been acknowledged is where the party has contracted to do a thing which the law considers impossible."

In the case of Cobb v. Harmon, 23 N. Y. 148, the defendant sought to be relieved from liability on a bond, which was given to insure one Herrick, applying for an assignment of all his property, and for a discharge as provided in the twelfth section of the act to abolish imprisonment for debt, and to diligently prosecute the same until he should secure a discharge, on the ground that he had failed because of the absence of the county judge at the time of the return of a certain process. There were other questions involved, but in passing upon this point Judge Lott, delivering the opinion of the court, said:

"If it be conceded that the performance of the condition of defendant's bond became impossible by the nonattendance of the county judge at the time and place appointed for making the application therein mentioned and thereby agreed to be made, they are nevertheless liable. It is a settled rule of law that, where a party by his own contract absolutely agrees to do an act or creates a duty or charge upon himself, he is bound to make it good notwithstanding any accident or other contingency not foreseen by, or within the control of, the party, unless its performance is rendered impossible by the act of God, or of the law, or the obligee; but where the law creates a duty or charge, and a party is disabled from performing it without any default in himself, and has no remedy over, then the law will excuse him."

In 25 N. Y. 272, in the case of Tompkins v. Dudley, the defendants became the sureties for one Chambers, who entered into an agreement to construct a school house, and to deliver it over, ready for use, on the 1st day of October, 1857. The building was not completed on that date, and on the 5th day of October, and before it was completed and turned over, it was destroyed by fire. Judge Davies, in delivering the opinion of the court, says:

"The builder, in the present case, by his own contract, created a liability and incurred a duty, which the defendants guarantied he should perform, and which he has not performed. In justification of such nonperformance he alleges the destruction of the building by fire and inevitable accident, without any fault on his part. The law is well settled that this is no legal justification for the nonperformance of the contract. This subject was carefully considered and elaborately discussed in the case of Harmony v. Bingham, and it was then held by this court that, when a party is prevented by the act of God from discharging a duty created by the law, he is excused; but when he engages unconditionally, by express contract, to do an act, performance is not excused by inevitable accident or other unforeseen contingency not within his control." "These principles," said Judge Davies in the same case, "have been applied by the supreme courts of Massachusetts, Connecticut, and New Jersey in cases almost entirely analogous to the one now under consideration."

Judge Miller, in delivering the opinion of the court in the case of Wheeler v. Insurance Co., 82 N. Y. 550, says that:

"While, as a general rule, where the performance of a duty created by law is prevented by inevitable accident, without the fault of a party, the default will be excused, yet when a person by express contract engages absolutely to do an act not impossible or unlawful at the time, neither inevitable accident nor other unforeseen contingency not within his control will excuse him, for the reason that he might have provided against them by his contract."

In the case of Howell v. Railroad Co., 37 Hun, 381, the railroad company had entered into a contract with the covenant:

"And the said parties of the second part, for themselves, their successors and assigns, do hereby covenant that they will erect within a reasonable time, at a cost of not less than $500.00, a respectable station house on the lot of land hereby conveyed, and forever keep and maintain the same as a regular daily stopping place (Sunday excepted) for not less than two trains daily in each direction, under the penalty of $3,500.00, which is hereby agreed between the parties as the liquidated damages for the substantial nonperformance of this covenant."

The case was argued before the general term of the Second department, and Justice Barnard, in delivering the opinion of the court, says:

"The covenant applied to the plaintiff's land, and can be performed in no other place fully. The defendant's road, with which the contract was made, was a road of very much greater significance than the short road. To go from

the new station by this road east, the traveler must first go to Hunter's Point, a distance of three miles, and then start by defendant's road. * * * The parties had a right to contract for themselves, and a court should give proper weight to that fact. Finally, the defendant is not bound to the plaintiff to keep even the new station at all for any given time. It is for its interest to do so at present, but it may move it or discontinue it. A covenant with the plaintiff is not answered by a performance in another place, and with no guaranty of a continuance. It seems to me, therefore, that there is not only no substantial performance, but a complete nonperformance, as to this covenant. The case does not fall within the cases cited. Generally, these cases arise in actions upon contracts for building and like contracts. If the performance is substantial, and the defect can be made good with money, the action is upheld, and justice done by compensation for defects."

This case, which was affirmed by the court of appeals without an opinion (107 N. Y. 684, 14 N. E. 611), following the lines of previous cases, holds that there is no substantial compliance with the covenants where the terms of the contract in their relation to both parties are not carried out; and the fact that the Bellevue Land & Improvement Company operated its cars according to the terms of its contract, except at such times as it was prevented from so doing by the rigors of winter, cannot be construed to be a substantial compliance with the covenant. The parties making the contract knew the kind of weather they were likely to encounter in the operation of their road, and they were equally aware that the property would not be worth one-half the price which it then commanded except for the guaranty that the railroad would be continued in active operation at all times, within the hours specified, thus enabling residents of the locality to go to and from their business in the city of Buffalo. While it is probably true, as contended by the defendant, that during the time the road was blockaded there was no inconvenience to passengers, the question is not modified by this fact. If the road could default when there were no passengers without becoming liable to the alternative covenant of the contract, it might do so at any time. There could be no passengers, in the strict use of that word, as applied to transportation companies, unless there were cars to convey them; and it was of the essence of this contract, not that the convenience of passengers should be considered, but that the plaintiff company should be able to guaranty to its customers that they should have a means of going to and coming from the city of Buffalo "as often as once every half hour from 7 a. m. to 8 p. m. of each day," and there could be no substantial compliance with that covenant except by actually running its cars upon such a schedule each day.

In the recent case of Ward v. Building Co., 125 N. Y. 234, 26 N. E. 256, the court, speaking through Judge Gray, sets forth the law clearly in reversing the judgment of the special term and in sustaining the general term. The facts in the case are sufficiently outlined in Judge Gray's opinion, in which he says:

"The appellant seeks to excuse the failure to perform his agreement, and to be legally absolved from the pecuniary loss consequent thereupon, by invoking the application of an equitable rule which relieves from a penalty and from forfeiture whenever performance has been rendered impossible by the act of God, by which expression he characterizes the storms and atmospheric disturbances in the state of New York and elsewhere which set in about March 12, 1888, and were popularly described as 'the blizzard.' We do not

think, however, that this is a case for equitable relief, or for any such application of the rule referred to. By the original contracts of the parties, default in the completion of the houses,. which were the subject-matter of their making, subjected the contractor to the liability to respond to the owner in a sum measured by the number of days of default, and agreed upon between· them to be in liquidation of all damages. When the default occurred, the.new contract which followed did not excuse the plaintiff, or waive his default, but, on the contrary, was an agreement between the parties fixing what the· amount of the sum due by way of liquidated damages would be upon a certain date, and stipulated that it should be due and owing then if the contractor's work still remained unfinished. The last agreement has no further· bearing upon this matter than to evidence the fact that the continuing default of the contractor was not excused, and that, if he chose to litigate the question of an excuse by the act of God, which his lawyer advanced, he was· at liberty to do so. It was simply an agreement in settlement of the controversies which had arisen, but which left out of them, for subsequent litigation, the one question of what is there called the 'penalty.' Whether the sum· agreed between parties to be paid in the event of the breach of some agreement is termed by them a 'penalty' or 'liquidated damages' is not controlling· upon the question of construction. Their use of such words is not always conclusive as to their legal meaning. To get at that, we must consider the· subject-matter and nature of the agreement, and understand clearly the intention of the parties. If it shall then appear that the damage and loss, which may be presumed to result from nonperformance, are uncertain and incapable of exact ascertainment, then the payment or liability fixed by them must be deemed to be liquidated damages, and recoverable as such. * * * The damages were liquidated, and the contract made no provision against the result of an interference with its performance by the intervention of occurrences unforeseen, and beyond the plaintiff's control. Having contracted absolutely to complete the houses on or before a certain date, unforeseen contingencies, no matter of what nature, are not available to plaintiff as a defense to the exaction of damages."

In the case of Railway Co. v. Hoyt, 149 U. S. 1, 13 Sup. Ct. 779, to which the attention of the court has been invited, the syllabus would· seem to indicate a modification of the doctrine so uniformly upheld by the state courts, but a careful reading of the case shows that this is not intended, and that the case, instead of sustaining the theory of a modification of the rule in respect to a substantial compliance, is decided squarely upon the ground that the contract had been fully complied with, and that the court below was in error in having placed a forced and unnatural construction upon the covenant. The railroad company in this case covenanted with an elevator company in the city of Chicago that the "total amount of grain received at said elevators shall be at least 5,000,000 bushels on an average for each year during the term of this lease; and, in case it shall fall short of that amount, the said party of the first part agrees to pay to the said party of the second part one cent per bushel on the amount of such deficiency." The elevator company, on its part, agreed to take care of 1,000,000 bushels of wheat for the railroad company. The elevator company, doing business for other customers, became crowded for space, and, after having received the 1,000.000 of bushels of grain from the·railroad company, refused to accept more, although it was tendered, and because of this refusal on the part of the elevator company there was not "received at said elevators" the amount of grain which the company had contracted to deliver. The court below held that this was the contract between the parties, and that, in spite of

the refusal of the elevator company to accept the grain tendered by the railroad company, the latter was bound to pay the sum of one cent per bushel on the deficiency. The supreme court, delivering, its opinion through Mr. Justice Jackson (149 U. S. 1, 13 Sup. Ct. 779), reversed this judgment, not upon the question of law, but upon the facts. Mr. Justice Jackson, after reviewing the facts, says:

"It is thus shown that, in addition to what was actually received, there was tendered by the railroad company, at the place and in the manner provided for in the contract, 8,685,269 bushels, which the elevator could not accept, and did not receive and store. The amount so tendered, with that actually received, exceeded the total amount which the railroad company agreed that the lessees should have the opportunity to accept and store, and this we hold to be a full and complete compliance by the railroad company with the terms and true meaning of the covenant. To hold otherwise would render the railway company liable for the inability of the lessees to accept the performance that was offered by it. It would require the clearest and most unqualified understanding on the part of the railroad company to subject it to such a liability."

Read in connection with this statement, and bearing in mind that the court below held the railroad company liable upon the grounds that the elevator company had not "received" the grain, though it had actually been tendered in good faith, the comments of the court, as cited in the syllabus, cannot be construed to sustain the contention of the defendant in this action. The court said:

"There can be no question that a party may, by an absolute contract, bind himself or itself to perform things which subsequently become impossible, or to pay damages for the nonperformance; and such construction is to be put upon an unqualified undertaking where the event which causes the impossibility might have been anticipated and guarded against in the contract, or where the impossibility arises from the act or default of the promisor. But where the event is of such a character that it cannot be reasonably supposed to have been in the contemplation of the contracting parties when the contract was made, they will not be held bound by general words, which, though large enough to include, were not used with reference to the possibility of, the particular contingency which afterwards happens."

That is to say, where a railroad company enters into a contract with an elevator company, agreeing that it shall receive a certain quantity of grain from its lines, the contract is to be construed that the elevator company is to have the opportunity to receive such an amount, and not that the railroad company shall be obliged to make the company receive what it cannot receive. The contract was for the benefit of the elevator company. It was interested in being assured of a profitable business; and all that the railroad company or the elevator company had in mind was the delivery at the elevators of a certain quantity of grain, and this reasonable interpretation was given it by the supreme court. There is no such question involved in the case now under consideration. There is no uncertainty in the language. It was deliberately entered into to accomplish certain results, and was undertaken in consideration of a large sum of money; and there can, therefore, be no question as to the right of the plaintiff in this action. It is entitled to a decree in accord with the alternative covenants of the contract entered into by the parties on a full understanding of the case, and it is so ordered.