# Cases

# FOURTH DEPARTMENT

IN THE

## APPELLATE DIVISION,

### July, 1898.

---

BUFFALO AND LANCASTER LAND COMPANY, Respondent, *v.* THE
BELLEVUE LAND AND IMPROVEMENT COMPANY, Appellant.

*Contract for the sale of land — agreement to repurchase if a railroad is not built
and operated — what is not a violation of the agreement to operate.*

A contract was made by which the party of the first part thereto, in considera-
tion of the purchase of certain land by the party of the second part, agreed
that an electric street railroad should be constructed, maintained and operated
over said premises " for the convenience of passengers as often as once every
half-hour from 7 A. M. to 8 P. M. of each day, as such street railroads are usu-
ally run, until said land is sold," and further covenanted " that in case said
street railway should not be constructed, maintained and operated as hereinbe-
fore provided, the said party of the first part will, at the request of the party
of the second part, take back the said land," and " will repay to the party of
the second part all money which has or may be paid to the party of the first
part, pursuant to the terms of the said agreement."

In an action brought to enforce the specific performance of the alternative pro-
vision for the repurchase of the land, it appeared that the railway referred to
in the agreement was constructed and in operation before the 1st day of May,
1893, and had since that date been operated, except during the whole or a sub-
stantial part of the period from December 1, 1894, to April 1, 1895, during
which period, by reason of heavy snowfalls and high winds, the railroad was
so blockaded as to render it impossible to run cars over it as required by the
contract, although such drifts were removed from the railroad with the appli-
ances and assistance usually and ordinarily employed for that purpose by street
railroads, and when so removed the cars were run until the railroad became again
blockaded by the snowdrifts.

It further appeared that there had been no market since 1893 for the property,
and it was found by the trial court that " its salability under the existing con-

ditions does not appear to have been affected by such interruptions in the operation of said street railroad.".

*Held,* that the interruption of the operation of the railroad did not constitute such a breach of the contract as it was contemplated by the parties, at the time when they entered into it, would entitle the party of the second part thereto to a specific enforcement by a court of equity of the alternative provision of the· contract requiring a repurchase of the premises by the party of the first part thereto.

FOLLETT and GREEN, JJ., dissented.

APPEAL by the defendant, The Bellevue Land and Improvement Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Erie on the 8th day of January, 1898, upon the decision of the court rendered after a trial at the Erie Special Term.

In June, 1892, the defendant entered into an agreement in writing with Charles L. Woodbridge and others for the sale to them of certain lands situated in the town of Lancaster, Erie county, being parts of lots 94 and 95, township 10, range 6 of the Buffalo Creek Indian Reservation.

In February, 1893, Charles L. Woodbridge and his associates organized the Buffalo and Lancaster Land Company (the plaintiff), a domestic corporation, for the purpose of buying, selling, leasing, mortgaging and otherwise acquiring and disposing of land, and for certain other speculative purposes. Thereafter the defendant conveyed the land described in the complaint to Woodbridge and others by a deed bearing date the 22d day of May, 1893, which was recorded on the 27th of June, 1893. Woodbridge and his associates executed a bond and a mortgage collateral thereto, which mortgage was in the sum of $55,580, to the defendant, bearing date the 31st of May, 1893, and was recorded the 22d of June, 1893. On the 31st of May, 1893, Woodbridge and his associates conveyed the land to the plaintiff by a deed bearing date the 31st of May, 1893, recorded on the 29th of June, 1893, which deed seems to have been delivered in consideration of the capital stock of the plaintiff. In March, 1893, a second contract was executed by the defendant. That contract recites that the plaintiff was about to take a conveyance from Woodbridge and his associates of the said land, and it refers to the agreement of June, 1892, and contains the following language :

" That in consideration of the premises and the sum of one dollar

paid by the party of the second part to the party of the first part, and for other good and valuable considerations, the party of the first part agrees, in case the parties to said agreement of the second part shall make the conveyance hereinbefore recited, that an electric street railroad shall be constructed, maintained and operated, connected with the street railroad system of the city of Buffalo, and running thence to the Village of Lancaster, and that the said railroad shall run over said land and in and along a certain street or highway one hundred feet wide, as the same is now located, which street or highway runs in a direction parallel, or nearly parallel, to the northerly line of said land; that said street railway shall be completed and in operation on or before the first day of May, 1893; that said street railway shall be maintained in good condition and in operation until the said land shall be sold by the party of the second part, and that, after the completion of said railroad, cars shall be run thereon for the convenience of passengers as often as once every half hour from 7 A. M. to 8 P. M. of each day, *as such street railroads are usually run, until said land is sold.* The party of the first part further covenants that in case said street railway shall not be constructed, maintained and operated as hereinbefore provided, the said party of the first part will, at the request of the party of the second part, take back the said land, provided said land shall be free and clear from all liens and incumbrances, except a mortgage made by the parties to said agreement, of the second part, to the party of the first part, to secure the payment of the sum of fifty-five thousand five hundred and eighty ($55,580.00) dollars. * * * And thereupon the party of the first part will repay to the party of the second part all money which has or may be paid to the party of the first part pursuant to the terms of the said agreement, and all moneys which may have been paid on said mortgage or the bond to secure which the same is given, and all money which may have been paid on account of taxes or assessments levied or assessed upon said premises since the first day of June, 1892, and will pay to the party of the second part the further sum of five thousand ($5,000.00) dollars, which it is hereby agreed shall be full liquidated damages for the breach of the foregoing covenant for the construction, maintenance and operation of said street railway, and the party of the first part will there-

.upon, at the request of the party of the second part, discharge said mortgage."

Plaintiff's complaint, after setting out the contracts stating the leading facts already mentioned and some others, demanded judgment for the sum of $35,572.16, with interest from the 10th of October, 1896.

The answer of the defendant, among other things, sets up that the land was, and is, "wholly unimproved and unoccupied, and has had no person or persons residing thereon or desirous of riding in said cars, and that the winter of 1894 and 1895, and the month of March, 1895, being the times mentioned or referred to in the said complaint, were uncommonly and unusually severe, and large and unusual and uncommon bodies of snow, during said alleged months, covered the said land and said railway and the same were blown and drifted over and upon said railway to great depths and to about the depth of from three to five feet, and the said defendant was unable, by all the exertions it could make or by such exertions as were made to clear other street railways in the county of Erie, and which efforts it did make to clear said railway from said snow and snow drifts, and was unable, while said snow and snow drifts continued, to run its cars on or over said railway, and said defendant in good faith endeavored, by its apparatus and appliances, which it, during all the said time, supplied and provided for that purpose, and which were the same as were usually supplied and provided by other street railways in said county, to clear said railway of said snow and snow drifts to the extent that would permit and render it possible to run said cars over the said railway; and it was not possible so to do, and when the said drifts were partially cleared the winds carried the snow into them again in such quantities as to completely blockade the said railway and render the same impassable; and the said defendant, in its said efforts and endeavors to open and clear said railway, broke and disabled its motor power on its said cars, and was unable to obtain other motor apparatus to replace those so broken and disabled, although it in good faith endeavored speedily so to do, and it was by reason and means of the said obstruction of the said railway and the inability to remove the snow and snow drifts, or to keep the same removed, that its cars were not continuously run, and were prevented from being

so run over said railway; and during the only days in December, 1894, and January, February or March, 1895, when said cars were not run on the said railway they were prevented from running, and this defendant was prevented from running them on the said railway by the causes aforesaid and not otherwise."

The issues were brought to trial at a Special Term, and the learned judge who presided at that term treated the action as one on the equity side of the court. At the commencement of the opinion delivered by him he said : " This action was brought for the purpose of compelling the defendant to a specific performance of the alternative covenants of a contract, upon the ground that the party was in default, and that it had failed to perform certain specific covenants going to the essence of the contract."

The relief which the trial judge authorized indicates that throughout he treated the action as one on the equity side of the court.

The 14th finding of fact is as follows :

" *Fourteenth.* That the said Bellevue Land and Improvement Company constructed, or caused to be constructed, an electric street railroad connected with the street railroad system of the city of Buffalo, running thence to the village of Lancaster, and running over the land mentioned in the said deed and mortgage, and in and along a certain street or highway one hundred feet wide, as the same was located on the 21st day of June, 1893, which street or highway runs in a direction parallel or nearly parallel to the northerly line of said land ; that said street railway was completed and in operation on or before the first day of May, 1893; and said railroad has been maintained in good condition ever since that time, and has been operated to the time of the trial of these actions, except during the winter of 1894–5, as hereinafter found."

The 15th finding of fact is as follows :

" *Fifteenth.* That during the whole or a substantial part of the period elapsing from December 1st, 1894, to April 1st, 1895, cars were not run on the said electric street railway as often as once every half hour, from 7 A. M. to 8 P. M. of each day, and that during said period there was a substantial failure to run cars on said electric street railway on the days and at the times and intervals required by said contract set forth in the above ninth finding of fact; that the winter of 1894 and 1895 was of unusual severity,

and the failure to run said cars over or on said railroad as aforesaid was caused and resulted from said railroad becoming blocked with snow and snow drifts, caused by heavy snow falls and high winds, rendering it practically impossible to run cars over said railroad while the said snow and snow drifts continued on the said railroad, and the same were removed from said railroad with the appliances and assistance usually and ordinarily employed for that purpose by street railroads, and when the same were so removed from said railroad the running of cars was resumed and continued, a car passing over said railroad once every half hour until the railroad became blocked again in the manner hereinbefore set forth."

It appears by the evidence that the plaintiff did not learn of the facts mentioned in the two findings which we have just quoted until the month of October, 1896, and such fact is found in the 19th finding; and that, in that month, it requested the defendant "to take back" the land mentioned and to pay to the plaintiff $35,572.10, being the amount alleged to have been paid. It is found that none of the land has been sold by the plaintiff or in any manner improved since the making of the contract of March, 1893, and that the land is vacant and unoccupied, having no buildings whatever upon it.

The 20th finding of fact is as follows:

" *Twentieth.* That it was practically impossible for the said Bellevue Land and Improvement Company to operate the said electric street railway during the winter of 1894–5 pursuant to the terms of the agreements dated June 1, 1892, and March 1, 1893, and referred to in the above second and ninth findings of fact."

It was also found that there has been no market since 1893 for said property, " and its salability under the existing conditions does not appear to have been affected by such interruptions in the operation of said street railroad, and during the winter and early spring of 1894 and 1895, no person was shown by the evidence to have gone to or upon said land, or any part thereof, to observe or examine it, or with the intention of buying it, or any part of it, and no damage appeared by the evidence to have been caused to any person interested in said lands by the failure of the Bellevue Land and Improvement Company, or the company owning or engaged in the operation of said street railroad, to run cars on said railroad when

it was obstructed or blocked with snow or snow drifts, or when the cars had been disabled by the exertions made to run them on said railroad, and such interruptions as there were to the operation of said street railroad during the month of December, 1894, and the months of January, February, March and April, 1895, were not due to any act or omission on the part of the said Bellevue Land and Improvement Company, or the company owning or engaged in the operation of said street railroad, but were due to the heavy storms which prevailed at the time of such interruptions."

The 22d finding of fact is as follows:

" *Twenty-second.* That the said electric street railroad agreed to be constructed by said Bellevue Land and Improvement Company was completed during the early part of April, 1893, and has been in operation until the time of this trial, except during the winter of 1894–5, as found in the above fifteenth finding of fact, and is known as the Buffalo, Bellevue and Lancaster Railroad."

It is found that, from the completion of the road down to the time of the trial, the defendant has maintained a power house for the purpose of supplying electric power to run and operate cars on the said electric road; "that the said power house was so constructed and maintained, and was supplied with the machinery to produce more power than was required to propel the electric cars over said railroad every half hour from 7 A. M. to 8 P. M. of each day when the said railroad was not obstructed, or blocked, as hereinbefore stated, and that a repair shop was there maintained by the said Bellevue Land and Improvement Company, with a sufficient and competent number of qualified men to repair said cars whenever any of them became disabled, and the said company during the said winter and spring of 1894 and 1895, at the same power house, supplied duplicate parts of the apparatus of its cars as were liable to be disabled for their repair whenever said apparatus was needed, and, during the fall of 1894, contracted with an establishment in the best standing at Schenectady, engaged in the manufacture of electrical apparatus for operating cars on electric railways, for additional motors of double the ordinary power, and the same were received by the said Bellevue Land and Improvement Company at said power house from early in January, 1895, from time to time, and were placed on its cars and snow plows, the more effectually and surely

by their weight and impact to run the said electric cars over said railroad, and to remove the snow and snow drifts therefrom; and from the time the said cars were so supplied with said increased power motors, they were so used and employed, as such cars were used on other street railroads, to clear said railroad of snow and snow drifts, and to force their way through drifts of three to five feet depth, and said cars frequently became disabled by such use, by the motors and armatures burning out, when they were taken to such shop for repair, and repaired with all practicable diligence, and were then placed upon such railroad for use, and, besides the two snow plows in the use of said company during the winter of 1893 and 1894, and the early part of the winter of 1894 and 1895, to clear the said railroad of snow and snow drifts and enable it to run its cars thereon — a much more powerful and effectual snow plow was manufactured by and for such company, and used upon said railroad from the middle of February, 1895, in removing the snow and snow drifts from such railroad; and the men employed by said company, including those operating its cars as motormen and conductors, were also employed shoveling the snow from the drifts on said railroad, and each car had an apparatus of its own to be, and was, applied by the motormen to clear said railroad rails. The said men and the said snow plows were employed in the daytime, and the night time in opening snow drifts blown upon said railroad, and in cleaning the same for use by the electric passenger cars, a larger number of which cars were provided for the use of said railroad than were required to run one of such cars over said railroad once every half hour from 7 A. M. to 8 P. M. of each day, when said railroad was so cleaned of snow drifts as to enable the said cars to run on said railroad; and they were so run by said company while said railroad was so kept open as to permit them to be run or operated on said railroad, and they were so run whenever the snow drifts on said track permitted them to be run. And other electric railroads extending from the city of Buffalo into the open country were obstructed and blocked with snow and snow drifts during the winter of 1894 and 1895, which prevented cars from being run on such electric street railroads, while such railroads were so obstructed and blocked, and the means taken to open such railroads and remove the snow and snow drifts therefrom were a snow plow or plows, men

engaged in shoveling and efforts made to run the cars through the snow and snow drifts by which the motors of cars were burned out and cars were disabled, and said efforts resulted in opening such railroads only for short periods, when the railroads would be again blocked with drifts of snow, preventing the cars from being run upon them, and the cars were run upon said railroads only when they were so kept clear of snow drifts. And during the winter and spring of the year 1893 and 1894 the said two snow plows first in use, and the electric cars with one-half the motor power supplied to them during the latter part of the winter of 1894 and 1895, and no larger force of men, were able to and did keep said railroad clear of snow and snow drifts during the winter of 1893–4 so as to permit the said electric cars to run over said railroad every half hour of each day from 7 A. M. to 8 P. M., excepting about one hour detention during that time.

" *Twenty-fourth.* That from the opening of said railroad in the early part of April, 1893, until the trial of this action, the said Bellevue Land and Improvement Company has supplied a number of electric cars for the carrying of passengers thereon, each of which cars was supplied with the usual motor used on street railroad electric cars.

" *Twenty-fifth.* That from the early part of December, 1894, to about the middle of March, 1895, the weather at various times was cold and windy, and large snow falls occurred from time to time during said period and the snows were blown in drifts on portions of said electric railroad, and said drifts were at times and in some places from five to ten feet deep, and when not removed prevented and obstructed the regular running of said electric cars over and upon said railroad.   *   *   *

" *Twenty-seventh.* That when said railroad was opened by the clearing of snow therefrom the running of said passenger cars thereon was resumed by said Bellevue Land and Improvement Company and continued until again interrupted by snow drifts upon portions of said railroad track."

It is found that some of the passenger cars in the winter of 1894–1895 became disabled " by endeavors and efforts made to force such passenger cars through the snow drifts, and the electric motors

therein were at different times burnt out and the cars thereby disabled and rendered useless until they could be and were repaired." A repair shop was maintained and supplied with duplicate apparatus to be attached to disabled cars, "and during the latter part of said winter of 1894–5 provided heavier motors to be placed upon and used upon some of said passenger cars."

"*Thirty-first.* That said street railroad was run during the month of December, 1894, and the months of January, February, March and April, 1895, *as similar street railroads in the vicinity of Buffalo were run during that period.*"

The 35th finding of fact is as follows:

"*Thirty-fifth.* The defendant in action No. 1 and the plaintiff in action * Nos. 2, 3, 4 and 5, having requested the court to find, as a fact, that there was substantial performance by it of the agreement which is referred to in the ninth finding, as Exhibit 2, as to the construction, maintenance and operation of such electric street railroad the court declines so to find as to the operation of the same; but finds that there was not substantial performance of said agreement as to the operation of said electric street railroad."

The 3d conclusion of law is as follows:

"*Third.* That the phrase in the agreement of March 1st, 1893, 'as such railroads are usually run,' does not limit or modify or excuse the performance of the covenant therein contained, ' that after the completion of said railroad cars shall be run thereon for the convenience of passengers as often as once every half hour from 7 A. M. to 8 P. M. of each day.'

"*Fourth.* That by reason of the failure to operate said street railway as aforesaid, there has been a substantial breach of agreements of June 1st, 1892, and March 1st, 1893, on the part of the said Bellevue Land and Improvement Company.

"*Fifth.* That the difficulty or impossibility of the performance by said Bellevue Land and Improvement Company of said agreements of June 1st, 1892, and March 1st, 1893, constitutes no excuse for its failure so to perform."

"*Ninth.* That the said Buffalo and Lancaster Land Company is entitled to recover from said Bellevue Land and Improvement Com-

---

* *Sic.*

pany the liquidated damages prescribed by the agreement dated respectively June 1st, 1892, and March 1st, 1893."

Judgment was ordered canceling the bond and mortgage already mentioned and ordering a recovery in favor of the plaintiff for $37,383.63, with interest from October 10, 1896; and that upon such payment the plaintiff deliver to the defendant the deed of conveyance of the premises described in the said mortgage, which deed was heretofore tendered and offered in evidence on the trial; and the defendant was ordered to surrender and deliver up to the plaintiff said bond and mortgage and to execute any further instrument that may be necessary to carry the judgment to be entered into effect. The decision also dismissed the complaint in actions Nos. 2, 3, 4 and 5 upon the merits, and held that none of the defendants in those actions " are personally liable to the said Bellevue Land and Improvement Company in any event, in any sum whatever, and that each of the defendants in said actions be forever discharged from any liability to the said Bellevue Land and Improvement Company, and that the defendant, said Buffalo and Lancaster Land Company, in each of said actions recover the costs of said actions, respectively, against said Bellevue Land and Improvement Company, that is to say, one bill of costs in each of said actions and have execution therefor in each of said actions."   And a separate judgment in the five actions was directed to be entered upon filing the decision.

*John G. Milburn,* for the appellant.

*Simon Fleischmann,* for the respondent.

HARDIN, P. J.:

Manifestly this action is for specific performance of the agreement set out in the complaint, and was so treated by the parties and the trial court. Upon all the proofs and allegations of the parties a question was presented for the trial court to exercise a judicial discretion as to whether there should be a specific performance of the contracts alleged in the complaint or not. (*Rochester & Kettle Falls Land Co.* v. *Roe,* 8 App. Div. 367.)   A similar doctrine was laid down in *Dunckel* v. *Dunckel* (141 N. Y. 434), and in *Frain* v. *Klein* (18 App. Div. 65).

In *Stokes* v. *Stokes* (155 N. Y. 590) MARTIN, J., said: " The right

of specific performance rests in the judicial discretion of the court, and may be granted or withheld upon a consideration of all the circumstances and in the exercise of such discretion. (Citing cases.) It is a well-established principle relating to this subject that specific performance will never be decreed where it would be inequitable. It is immaterial whether the fact that it is inequitable arises from the provisions of the contract or from external facts or circumstances which affect the situation and relations of the parties, for in either case it may constitute a sufficient ground for a court of equity to withhold this peculiar relief, and to leave the parties to their legal remedy." (Citing cases.)

In *Trustees of Columbia College* v. *Thacher* (87 N. Y. 317) DANFORTH, J., said: "It certainly is not the doctrine of courts of equity to enforce by its peculiar mandate every contract, in all cases, even where specific execution is found to be its legal intention and effect. It gives or withholds such decree according to its discretion, in view of the circumstances of the case, and the plaintiff's prayer for relief is not answered, where, under those circumstances, the relief he seeks would be inequitable. * * * If for any reason, therefore, *not referable to the defendant*, an enforcement of the covenant would defeat either of the ends contemplated by the parties, a court of equity might well refuse to interfere, or if in fact the condition of the property by which the premises are surrounded has been so altered ' that the terms and restrictions ' of the covenant are no longer applicable to the existing state of things. * * * And so, though the contract was fair and just when made, the interference of the court should be denied, if subsequent events have made performance by the defendant so onerous that its enforcement would impose great hardship upon him, and cause little or no benefit to the plaintiff."

In Story's Equity Jurisprudence (§ 751a) it is said : "Courts of equity will also, in allowing or denying a specific performance, look not only to the *nature of the transaction*, but also to the character of the parties who have entered into the contract." And in section 769 that same author says : "We have already seen that the specific execution of a contract in equity is a matter, not of absolute right in the party, but of sound discretion in the court. Hence, it requires a much less strength of case on the part of the defendant to resist

a bill to perform a contract than it does on the part of the plaintiff to maintain a bill to enforce a specific performance." And in section 742 he says: " In truth, the exercise of this whole branch of equity jurisprudence, respecting the rescission and specific performance of contracts, is not a matter of right in either party; but it is a matter of discretion in the court; not, indeed, of arbitrary or capricious discretion, dependent upon the mere pleasure of the judge, but of that sound and reasonable discretion which governs itself as far as it may by general rules and principles; but, at the same time, which withholds or grants relief, according to the circumstances of each particular case, when these rules and principles will not furnish any exact measure of justice between the parties."

The evidence delivered at the Special Term satisfactorily establishes that the defendant had built, maintained and operated the road in accordance with the provisions of the contract until December, 1894, and the three following months in 1895. Apparently, the expenditure had been $150,000 to bring into existence the railroad in compliance with the conditions of the agreements that the railroad should be constructed; and it seems that, after it was constructed, it was operated in strict accordance with the terms of the contract until the storms prevented in the four months mentioned; and subsequent to those months the railroad was operated in accordance with the terms of the agreement down to the time of the trial, which occurred on the 10th of May, 1897. The evidence given at the trial satisfactorily supports the 20th finding, to wit, " That it was practically impossible for the said Bellevue Land and Improvement Company to operate the said electric street railway during the winter of 1894–5, pursuant to the terms of the agreements dated June 1, 1892, and March 1, 1893." The evidence also satisfactorily establishes that the plaintiff sustained no damage by reason of the non-operation during those months of the road. Indeed, the plaintiff did not become aware of the obstructions and inoperation until October, 1896, when it was seeking an opportunity to avoid its obligations.

It is contended in behalf of the respondent that the obligation on the part of the defendant by force of the language of the agreement of March 1, 1893, is absolute and unqualified to run cars every half hour from seven A. M. to eight P. M., under all conditions and

circumstances, until the plaintiff shall have sold the land which it purchased; and it, therefore, relies upon the doctrine laid down in *Harmony* v. *Bingham* (12 N. Y. 99); *Beebe* v. *Johnson* (19 Wend. 500); *Tompkins* v. *Dudley* (25 N. Y. 272) and *Ward* v. *Hudson River Building Co.* (125 id. 230). Those cases related to contracts which, in their terms, were absolute and without any qualification, and were so treated in the adjudications made in respect to them. However, there are numerous cases where courts have implied a condition in a contract where a performance of it had, without the fault of the party, became impossible. Such were the cases of *Dexter* v. *Norton* (47 N. Y. 62); *Lorillard* v. *Clyde* (142 id. 456); *Stewart* v. *Stone* (127 id. 507).

In searching for the intention of the parties at the time they used the language in respect to the building, maintaining and operating of the railroad and the times when cars should be run, force must be given to all the language used, including that which expressly declares " as such street railroads are usually run until said land is sold;" and that language is to be construed in the light of all the circumstances surrounding the parties at the time of the execution of the contract as well as the purposes to be accomplished by the construction, maintenance and operation of a street railroad. (*D., L. & W. R. R. Co.* v. *Bowns*, 58 N. Y. 573; *Russell* v. *Allerton*, 108 id. 288.) When the parties used the language they were contemplating a suburban railroad, and it is not unreasonable to suppose that they contemplated that such railroad should be operated as railroads of that character are usually operated in the neighborhood of the locality of the one provided for. Doubtless the words " every half hour from 7 A. M. to 8 P. M." related to the schedule that the road was to adopt in the operation of its cars, rather than to a purpose of making an imperative undertaking on the part of the defendant that its cars should thus be run in defiance of all obstacles or hindrances that might occur. It was understood by the parties that railroads adopt schedule time, and that there are, from sundry causes, embarrassments and difficulties which are encountered by street railroads in observing schedule time; and, hence, it is apparent that, with that thought in mind, the parties used the words " as such street railroads are usually run " to indicate the extent and nature of the obligation to be assumed by the contracting party. The con-

struction suggested seems to be such as to give rise to the supposition that that would accomplish the purpose of the parties, and to harmonize with the practical situation.   The construction suggested would serve "the convenience of passengers," which seemed to be one of the purposes of bringing the railroad into existence.   In this case there was no willful or intentional departure from the usual course of operating suburban railroads by the defendant.   The findings warrant the conclusion, as did the evidence, that the defendant made diligent efforts to operate the road without interruptions; and the findings also warrant the conclusion that the respondent's lands were not affected by the interruptions caused by the excessive storms of December, 1894, and the three following months of 1895. Indeed, there is an express finding that "no damage appeared by the evidence to have been caused to any person interested in said land by the failure of the Bellevue Land and Improvement Company, or the company owning or engaged in the operation of said street railroad, to run cars on said railroad when it was obstructed or blocked with snow or snow drifts."

In *Town of Mount Morris* v. *King* (77 Hun, 18) it was held that a "forfeiture is not favored by law, and the provisions of an agreement upon which it is based must be strictly construed."   In the course of the opinion delivered by HAIGHT, J., it was said in respect to an agreement then under consideration, that its stipulations were not intended to cover " trifling breaches of the contract that might be made in many ways, such as the failure to keep the road or some particular part thereof in as high a state of repair as the officers of the town might think it should be in," and that the special language used was to be read in connection with the whole contract.

If we turn to the exact language of the contract, we find that it is a stipulation that, in case said street railway shall not be constructed, maintained and operated as hereinbefore provided, the said party of the first part will, at the request of the party of the second part, take back the said land.   There has not been a failure to construct, to maintain or to operate the road.   As already suggested, the road was built at an expense of some $150,000.   It was maintained by a large expenditure of money and it was operated from the time it was opened down to the time of the trial, except the

period when the storms interfered for some four months. We think that that interruption was not such a breach of the contract as was contemplated by the parties at the time they entered into the agreement upon which reliance is placed for the right to have a court of equity enforce the alternative provisions of the contract. (*Kimball* v. *West*, 15 Wall. 379.)

The foregoing views lead to the conclusion that the decision of the trial court should be reversed.

ADAMS and WARD, JJ., concurred; FOLLETT and GREEN, JJ., dissented in favor of an affirmance on the opinion of WOODWARD, J., delivered at Special Term.

The following is the opinion delivered by WOODWARD, J., at the Special Term :

WOODWARD, J. :

This action was brought for the purpose of compelling the defendant to a specific performance of the alternative covenants of a contract, upon the ground that the party was in default, and that it had failed to perform certain specific covenants going to the essence of the contract. It was tried in connection with four other actions brought by the defendant against the plaintiff for the foreclosure of a certain mortgage, the real question at issue being the same in each case. It was established on the trial that the Bellevue Land and Improvement Company was in 1892 the owner of a considerable tract of land situate about half way between the village of Lancaster and the city of Buffalo, both in the county of Erie, about five miles distant from either place, and south of the village of Depew. On the 1st day of June, 1892, the Bellevue Land and Improvement Company entered into a contract in writing with Charles L. Woodbridge, Walter Hanford, Thomas Christie, Timothy Hogan & Sons, Cassine G. Wilson, J. Lester Woodbridge, Eugene Klein and Frank K. Roberts, agreeing to sell a portion of its land to the parties named for $600 an acre, amounting to $71,136. It was agreed that a portion of this purchase price should be paid in definite sums at certain specified times, and that the remainder should be secured by a bond and mortgage. The real estate involved in this transaction was, at the time, farm land, worth, in its then

condition, in the neighborhood of $200 per acre.  As an induce-
ment to the purchase of this land at the advanced price, the Belle-
vue Land and Improvement Company covenanted, among other
things, that it would "guarantee that an electric street railroad shall
be constructed, maintained and operated, connecting with the street
railroad system of the city of Buffalo, and running thence to the
village of Lancaster, and that it shall run in and along said avenue
(to be dedicated by the party of the second part, the plaintiff in this
action), when located, and that the construction of the said road
shall be commenced on or before the 1st day of July, 1892, and that
the same shall be completed and in operation on or before the 1st
day of May, 1893, and that said street railroad shall be maintained
in good condition and in operation until said land shall be sold by said
second parties, and that cars shall be run thereon for the convenience
of passengers after its completion as often as once every half hour,
from 7 A. M. to 8 P. M."   It was also covenanted that "should said
party of the first part fail to cause such street railroad to be con-
structed, maintained and operated as hereinbefore provided, it agrees
to take back from said second parties the land hereby contracted,
provided said land shall be free and clear from all liens and incum-
brances, except said mortgage and taxes and assessments, levied or
assessed thereon after this date, and to repay them all moneys which
they may have paid on this contract or on the said bond and mort-
gage, and to discharge said mortgage and to surrender to them said
bond, and it further agrees to pay said second parties $5,000, which
it is hereby agreed shall be full liquidated damages for such failure."

On the 1st day of March, 1893, the parties above mentioned, hav-
ing in the meantime been duly incorporated under the name of the
Buffalo and Lancaster Land Company, and having paid $15,556 of
the purchase money, a new contract, understood to embrace substan-
tially the same conditions, was entered into between the Bellevue
Land and Improvement Company, the defendant, and the Buffalo and
Lancaster Land Company, the plaintiff.  This new contract recites
that the party of the first part has heretofore entered into a contract
with the parties above named, "whereby the party of the first part
guarantees and agrees that an electric street railroad shall be con-
structed and operated over said land as will, by reference to said
agreement, more fully appear; and,

" WHEREAS, the parties to said agreement of the second part have received from the parties of the first part a conveyance of said land, and are about to convey the same to said party of the second part (The Buffalo and Lancaster Land Co.).

" Now, this agreement witnesseth, that in consideration of the premises and the sum of one dollar, paid by the party of the second part to the party of the first part, and for other good and valuable considerations, the party of the first part agrees, in case the parties to said agreement of the second part shall make the conveyance hereinbefore recited, that an electric street railroad shall be constructed, maintained and operated, connected with the street railroad system of the city of Buffalo, and running thence to the village of Lancaster, and that the said railroad shall run over said land and in and along a certain street or highway 100 feet wide, as the same is now located, which street or highway runs in a direction parallel, or nearly parallel, to the northerly line of said land; that said street railway shall be completed and in operation on or before the 1st day of May, 1893; that said street railway shall be maintained in good condition and in operation until the said land shall be sold by the party of the second part, and that after the completion of said railroad, cars shall be run thereon for the convenience (conveyance in the original contract, following the language of the statute) of passengers as often as once every half hour, from 7 A. M. to 8 P. M. of each day, as such street railroads are usually run, until said land is sold.

" The party of the first part further covenants that in case said street railway shall not be constructed, maintained and operated as hereinbefore provided, the said party of the first part will, at the request of the party of the second part, take back the said land, provided the said land shall be free and clear from all liens and incumbrances, except a mortgage made by the parties to said agreement, of the second part, to the party of the first part, to secure the payment of the sum of $55,580, which mortgage bears even date herewith, and except, also, taxes and assessments levied or assessed thereon since the 1st day of June, 1892, and except, also, any incumbrances upon said land or any defect in the title thereto of the party of the second part which existed at the time of the delivery of the deed to the parties to said agreement of the second

part; and thereupon the party of the first part will repay to the party of the second part all money which has or may be paid to the party of the first part, pursuant to the terms of said agreement, and all moneys which may have been paid on said mortgage or the bonds to secure which the same is given, and all money which may have been paid on account of taxes or assessments, levied or assessed upon said premises since the 1st day of June, 1892, and will pay to the party of the second part the further sum of five thousand dollars ($5,000), which it is hereby agreed shall be full liquidated damages for the breach of the foregoing covenant for the construction, maintenance and operation of said street railway, and the party of the first part will thereupon, at the request of the party of the second part, discharge said mortgage."

The plaintiff in this action received from the defendant a conveyance of the land in question, dedicating the land for the highway as provided in the original contract, paying upon the contract a sum aggregating $30,572.16, executed and delivered the bond and mortgage and generally complied in good faith with all the conditions of the contracts. The defendant made the transfer of the property, accepted money at various times, received the bond and mortgage, and constructed, maintained and operated the street railroad in accordance with the agreement; except that during the winter of 1894–1895 unusually heavy snows, accompanied by high winds, blockaded the highway to such an extent that for some days no cars were run over the line involved in this action, though the defendant company, through its employees, exerted itself in the effort to operate the road to an extent which fairly relieves it from any imputation of having willfully neglected its duties under the contract.

The question is, therefore, purely one of law. This court is called upon to decide whether the defendant company, having entered into a covenant with the plaintiff to operate its cars " as often as once every half hour, from 7 A. M. to 8 P. M. of each day, as such street railroads are usually run, until said land is sold," can be absolved from that agreement in a court of equity, and be allowed to foreclose its mortgage against the plaintiff, subjecting him to the risks inseparably connected with such a transaction when prices have suffered a sharp decline, and when the market for large tracts of speculative real estate is concededly inactive. It is substantially

agreed on the part of both parties, and it is in accord with the authorities, that both of the contracts involved in this action are but a single transaction; that they are to be construed together, and that the intent of the parties is to be gathered from the reading of each of the instruments in its relation to the other. Thus viewed, there can be no doubt that the defendant company, made up of business men of large experience, did covenant with the plaintiff in this action to construct, maintain and operate a street railroad over the lands purchased by the plaintiff; and that, in addition to the obligation which such railroad owed to the State to operate its cars in a reasonable manner for the accommodation of the public, the defendant company undertook, without exception, to run its cars "as often as once every half hour from 7 A. M. to 8 P. M. of each day," and the clause, "as such street railroads are usually run," has reference to the equipment, and to such incidental delays as might prevent the operation of its cars upon the exact schedule time, and cannot be construed to modify this express agreement to run the cars as often as every half hour. In such a case it is no part of the duty of a court of equity to interfere to relieve the defendant from the specific performance of its covenants.

"In the first place," says Mr. Justice STORY, in his Equity Jurisprudence (13th ed. p. 104) "in matters of positive contract and obligation, created by the party (for it is different in obligations or duties created by law), it is no ground for the interference of equity that the party has been prevented from fulfilling them by accident, or that he has been in no default, or that he has been prevented by accident from deriving the full benefit of the contract on his own side. Thus if a lessee on a demise covenants to keep the demised estate in repair, he will be bound in equity as in law to do so, notwithstanding any inevitable accident or necessity by which the premises are destroyed or injured; as if they are burnt by lightning, or destroyed by public enemies, or by any other accident, or by overwhelming force. The reason is, that he might have provided for such contingencies by his contract if he had so chosen; and the law will presume an intentional general liability where he has made no exception."

That the parties to this contract understood the nature of the obligations into which they were entering, and that they were aware of

this general rule of law, is evidenced by the numerous exceptions in respect to the covenant to receive back the land contained in the second contract, and which are not to be found in the first agreement. It was important to the purchasers of this property; indeed, it goes to the very essence of this contract, that there should be a street railroad prepared, not only to discharge its obligations to the State, but to afford intending purchasers an opportunity to reach the city of Buffalo at short and regularly stated intervals. This was one of the inducements which the Buffalo and Lancaster Land Company was to hold out to its customers; it was to enter into their contracts with individual purchasers, thus becoming identified with the land, and constituting a part of the property rights of the community which it was hoped to establish upon this purchase. If such a contract cannot be enforced, or, in the event of failure, if the alternative covenant is not to become operative, because of some accident against which the party has not provided, then there is no use of entering into specific agreements.

This was to a certain extent a speculative contract, entered into by two companies organized for the purpose of dealing in real estate. The value of the land under consideration depended very largely upon the construction and operation of this railroad, with special reference to the degree of comfort, speed and certainty with which intending purchasers might reach the city of Buffalo, which presumptively afforded the means of a livelihood for the greater part of such community, as it was expected would be centered upon this plot. For the purpose of giving this speculative value, and thus to induce the plaintiff company to purchase the property at a large advance upon its value as farm land, the defendant company waived the rights of a street railroad company under the laws and usages of this State, and specifically covenanted to run its cars "as often as every half hour, from 7 A. M. to 8 P. M. of each day," and failing to do this, it promised to restore the plaintiff to the position which it occupied on the day of entering into this contract, and to pay the sum of $5,000 as liquidated damages. "Equity," says Mr. Justice Story, "may compel parties to execute their agreements, but it has no authority to make agreements for them or substitute one for another;" and the defendant company having deliberately entered into a contract, one of the covenants of which it has failed to keep, there can be no doubt

that the plaintiff in this action is entitled to a decree for the specific performance of the alternative covenant. This is neither a new nor novel construction of the law; it is sustained by the highest authorities both in American and English jurisprudence, as well as by important considerations of public policy. In the case of *Dermott* v. *Jones* (2 Wall. 1) the defendant in error entered into a contract to construct a house on the premises of Miss Dermott, agreeing to build it according to the detailed plans and specifications furnished by Miss Dermott's architect, and to supply all matters requisite for the execution of the work, "in all its parts and details, *and for the complete finish and fitting for use and occupation of all the houses and buildings, and the several apartments of the house and buildings, to be erected pursuant to the plan of the work described and specified in the said schedule;* and that the work, and the several parts and parcels thereof, shall be executed, finished and ready for use and occupation, and be delivered over, so finished and ready," at a day fixed. Jones built the house according to the plans and specifications, except as they were modified by Miss Dermott, but, owing to inherent qualities of the soil, the foundation sank, the building became badly cracked, and, consequently, dangerous and uninhabitable. Miss Dermott caused the building to be torn down in part, and rebuilt upon an artificial foundation or float, and it thus became a perfect building. Jones having sued Miss Dermott in the Federal court for the District of Columbia for the price of the building, her counsel asked the court to charge that she was entitled to "recoup" the amount which it was necessary for her to expend, and this the court refused to do. The case went to the United States Supreme Court, and Mr. Justice SWAYNE, delivering the opinion of the court, said:

" The defendant in error insists that all the work he was required to do is set forth in the specifications, and that, having fulfilled his contract in a workmanlike manner, he is not responsible for defects arising from a cause of which he was ignorant, and which he had no agency in producing.

" Without examining the soundness of this proposition, it is sufficient to say that such is not the state of the case. The specifications and the instrument to which they are annexed constitute the contract. They make a common context, and must be construed

together. In that instrument the defendant in error made a covenant. That covenant it was his duty to fulfill, and he was bound to do whatever was necessary to its performance. Against the hardship of the case he might have guarded by a provision in the contract. Not having done so, it is not in the power of this court to relieve him. He did not make that part of the building 'fit for use and occupation.' It could not be occupied with safety to the lives of the inmates. It is a well-settled rule of law that if a party, by his contract, charge himself with an obligation possible to be performed, he must make it good, unless its performance is rendered impossible by the act of God, the law, or the other party. Unforeseen difficulties, however great, will not excuse him." (*Paradine* v. *Jane*, Aleyn, 26 ; *Beale* v. *Thompson*, 3 Bos. & Pul. 420.)

After citing various analogous cases, the court says : " The principle which controlled the decision of the cases referred to rests upon a solid foundation of reason and justice. It regards the sanctity of contracts. It requires parties to do what they have agreed to do. If unexpected impediments lie in the way, and a loss must ensue, it leaves the loss where the contract places it. If the parties have made no provision for a dispensation, the rule of law gives none. It does not allow a contract fairly made to be annulled, and it does not permit to be interpolated what the parties themselves have not stipulated."

In the case of *Beebe* v. *Johnson* (19 Wend. 500) the plaintiff had deeded to the defendants a certain right to make and vend a machine for threshing grain, agreeing to perfect the patents in England so as to protect the purchaser in his right to make and sell the machines in the province of Canada. It transpired that the laws of England forbade the granting of such a patent to a citizen of a country other than Great Britain or its provinces ; and the plaintiff sued the defendant for the purchase money, contending that, as the laws of England prevented him securing the English patents, he was not obliged to perform this covenant. The court, in discussing this case, said that " if the covenant be within the range of possibility, however absurd or improbable the idea of the execution of it may be, it will be upheld ; as where one covenants it shall rain to-morrow, or that the Pope shall be at Westminster on a certain day. To bring the case within a rule of a dispensation, it must appear *that the thing*

*to be done cannot, by any means, be accomplished;* for, if it is only improbable or out of the power of the obligor, it is not, in law, deemed impossible. \* \* \* If a party enter into an absolute contract without any qualification or exception, and receives from the party with whom he contracts the consideration of such agreement, he must abide by the contract, and either do the act or pay damages; his liability arising from his own direct and positive undertaking."

In the case of *Harmony* v. *Bingham* (12 N. Y. 107) where the defendants covenanted for a given price to deliver certain freight within a given time, and failed to do so, the court, delivering its opinion through Judge EDWARDS, say: "It is a well-settled rule that, where the law creates a duty or a charge, and the party is disabled from performing it without any default in himself, and has no remedy over, then the law will excuse him; but where the party, by his own contract, creates a duty or charge upon himself, he is bound to make it good, notwithstanding any accident or delay by inevitable necessity, because he might have provided against it by contract. \* \* \* This rule has been uniformly followed, and that, too, even in cases in which its application has been considered by the court as attended with great hardship. The only exception which has ever been acknowledged, is where a party has contracted to do a thing which the law considers impossible."

In the case of *Cobb* v. *Harmon* (23 N. Y. 148) the defendant sought to be relieved from liability on a bond, which was given to insure one Herrick applying for an assignment of all his property, and for a discharge as provided in the 12th section of the act to abolish imprisonment for debt, and to diligently prosecute the same until he should secure a discharge, on the ground that he had failed because of the absence of the county judge at the time of the return of a certain process. There were other questions involved, but in passing upon this point, Judge LOTT, delivering the opinion of the court, said: "If it be conceded that the performance of the condition of the defendant's bond became impossible by the non-attendance of the county judge at the time and place appointed for making the application therein mentioned, and thereby agreed to be made, they are nevertheless liable. It is a settled rule of law that where a party, by his own contract, absolutely engages to do an act,

or creates a duty or charge upon himself, he is bound to make it good, notwithstanding any accident or other contingency not foreseen by, or within the control of, the party, unless its performance is rendered impossible by the act of God, or of the law or the obligee; but where the law creates a duty or charge, and a party is disabled from performing it without any default in himself, and has no remedy over, then the law will excuse him."

In the case of *Tompkins* v. *Dudley* (25 N. Y. 272) the defendants became the surety for one Chambers, who entered into an agreement to construct a school house and to deliver it over ready for use on the 1st day of October, 1857. The building was not completed on that date, and on the fifth day of October, and before it was completed and turned over, it was destroyed by fire. Judge DAVIES, in delivering the opinion of the court, says: "The builder, in the present case, by his own contract, created a liability and incurred a duty, which the defendants guaranteed he should perform, and which he has not performed. In justification of such non-performance, he alleges the destruction of the building by fire an inevitable accident, without any fault on his part. The law is well settled that this is no legal justification for the non-performance of the contract. This subject was most carefully considered and elaborately discussed in the case of *Harmony* v. *Bingham* (2 Kern. 99), and it was then held by this court that when a party is prevented by the act of God from discharging a duty created by the law, he is excused; but when he engages unconditionally, by express contract, to do an act, performance is not excused by inevitable accident or other unforeseen contingency not within his control."

"These principles," says Judge DAVIES, in the same case, "have been applied by the Supreme Courts of Massachusetts, Connecticut and New Jersey, in cases almost entirely analogous to the one now under consideration."

Judge MILLER, in delivering the opinion of the court in the case of *Wheeler* v. *Connecticut Mutual Life Ins. Co.* (82 N. Y. 550), says that, "while, as a general rule, where the performance of a duty created by law is prevented by inevitable accident, without the fault of a party, the default will be excused, yet when a person by express contract engages absolutely to do an act not impossible or

unlawful at the time, neither inevitable accident nor other unfore-
seen contingency not within his control will excuse him, for the
reason that he might have provided against them by his contract."

In the case of *Howell* v. *Long Island R. R. Co.* (37 Hun, 381)
the railroad company had entered into a contract with the following
covenant: " And the said parties of the second part, for themselves,
their successors and assigns, do hereby covenant that they will erect
within a reasonable time, at a cost of not less than $500, a respect-
able station-house on the lot of land hereby conveyed, and forever
keep and maintain the same as a regular daily stopping place (Sun-
days excepted) for not less than two trains daily in each direction,
under the penalty of $3,500, which is hereby agreed between the
parties as the liquidated damages for the substantial non-perform-
ance of this covenant." The case was argued before the General
Term of the second department, and Justice BARNARD, in delivering
the opinion of the court, says: " The covenant applied to the
plaintiff's land and can be performed in no other place fully. The
defendant's road, with which the contract was made, was a road of
very much greater scope and significance than the short road. To
go from the new station by this road east, the traveler must first go to
Hunter's Point, a distance of three miles, and then again start by the
defendant's road. * * * The parties had the right to contract
to suit themselves, and a court should give proper weight to that
fact. Finally, the defendant is not bound to the plaintiff to keep
even the new station at all for any given time. It is for its interest
to do so at present, but it may move it or discontinue it. A cove-
nant with the plaintiff is not answered by a performance in another
place and with no guaranty of continuance. It seems to me, there-
fore, that there is not only no substantial performance, but a com-
plete non-performance as to this covenant. The case does not fall
within the cases cited. Generally, these cases arise in actions upon
contracts for building and like contracts. If the performance is
substantial, and the defect can be made good with money, the action
is upheld and justice done by compensation for defects."

This case, which was affirmed by the Court of Appeals without
an opinion (107 N. Y. 684), following the lines of previous cases,
holds that there is no substantial compliance with the covenants
where the terms of the contract, in their relation to both parties,

are not carried out; and the fact that the Bellevue Land and Improvement Company operated its cars according to the terms of its contract, except at such times as it was prevented from so doing by the rigors of winter, cannot be construed to be a substantial compliance with the covenant. The parties making the contract knew the kind of weather they were likely to encounter in the operation of their road; and they were equally aware that the property would not be worth one-half the price which it then commanded, except for the guaranty that the railroad would be continued in active operation at all times within the hours specified, thus enabling residents of the locality to go to and from their business in the city of Buffalo. While it is probably true, as contended by the defendant, that, during the time the road was blockaded, there was no inconvenience to passengers, the question is not modified by this fact. If the road could default when there were no passengers, without becoming liable to the alternative covenants of the contract, it might do so at any time; there could be no passengers, in the strict use of that word, as applied to transportation companies, unless there were cars to convey them; and it was of the essence of this contract, not that the convenience of passengers should be considered, but that the plaintiff company should be able to guarantee to its customers that they should have a means of going to and coming from the city of Buffalo "as often as once every half hour, from 7 A. M. to 8 P. M. of each day," and there could be no substantial compliance with that covenant except by actually running its cars upon such a schedule each day.

In the recent case of *Ward* v. *Hudson River Building Co.* (125 N. Y. 234) the court, speaking through Judge GRAY, set forth the law clearly in reversing the judgment of the Special Term and in sustaining the General Term. The facts in the case are sufficiently outlined in Judge GRAY's opinion, in which he says: "The appellant seeks to excuse the failure to perform his agreement, and to be legally absolved from the pecuniary loss consequent thereupon, by invoking the application of an equitable rule which relieves from a penalty and from forfeiture, whenever performance has been rendered impossible by the act of God; by which expression he characterizes the storms and atmospheric disturbances in the State of New York and elsewhere, which set in about March 12, 1888, and

were popularly described as 'The Blizzard.' We do not think, however, that this is a case for equitable relief, or for any such application of the rule referred to. By the original contracts of the parties, default in the completion of the houses, which were the subject-matter of their making, subjected the contractor to the liability to respond to the owner in a sum measured by the number of days of default, and agreed upon between them to be in liquidation of all damages. When the default occurred, the new contract, which followed, did not excuse the plaintiff or waive his default, but, on the contrary, was an agreement between the parties fixing what the amount of the sum due by way of liquidated damages would be upon a certain date, and stipulating that it should be due and owing them, if the contractor's work still remained unfinished. The last agreement has no further bearing upon this matter than to evidence the fact that the continuing default of the contractor was not excused, and that if he chose to litigate the question of an excuse by act of God, which his lawyer advanced, he was at liberty to do so. It was simply an agreement in settlement of the controversies which had arisen, but which left out of them, for subsequent litigation, the one question of what is there called the penalty. Whether the sum agreed between parties to be paid in the event of a breach of some agreement is termed by them a ' penalty,' or ' liquidated damages,' is not controlling upon the question of construction. Their use of such words is not always conclusive as to their legal meaning. To get at that we must consider the subject-matter and nature of the agreement and understand clearly the intention of the parties. If it shall then appear that the damage and loss, which may be presumed to result from non-performance, are uncertain and incapable of exact ascertainment, then the payment or liability fixed by them must be deemed to be liquidated damages and recoverable as such. * * *

" The damages were liquidated and the contract made no provision against the result of an interference with its performance by the intervention of occurrences unforeseen and beyond the plaintiff's control. Having contracted absolutely to complete the houses on or before a certain date, unforeseen contingencies, no matter of what nature, are not available to plaintiff as a defense to the exaction of damages."

In the case of *The Chicago, Milwaukee & St. Paul Ry. Co.* v. *Hoyt* (149 U. S. 1), to which the attention of the court has been invited, the syllabus would seem to indicate a modification of the doctrine so uniformly upheld by the State courts, but a careful reading of the case shows that this is not intended, and that the case, instead of sustaining the theory of a modification of the rule in respect to a substantial compliance, is decided squarely upon the ground that the contract had been fully complied with, and that the court below was in error in having placed a forced and unnatural construction upon the covenant.   The railroad company in this case covenanted with an elevator company in the city of Chicago that the "total amount of grain received at said elevator shall be at least five million bushels on an average for each year during the term of this lease, and in case it shall fall short of that amount, the said party of the first part agrees to pay to the said parties of the second part one cent per bushel on the amount of such deficiency."   The elevator company, on its part, agreed to take care of 1,000,000 bushels of wheat for the railroad company.   The elevator company, doing business for other customers, became crowded for space, and after having received the 1,000,000 bushels of grain from the railroad company, refused to accept more, although it was tendered, and because of this refusal on the part of the elevator company, there was not "received at said elevator" the amount of grain which the company had contracted to deliver.   The court below held that this was the contract between the parties, and that, in spite of the refusal of the elevator company to accept the grain tendered by the railroad company, the latter was bound to pay the sum of one cent per bushel on the deficiency.   The Supreme Court, delivering its opinion through Mr. Justice JACKSON (149 U. S. 1), reversed this judgment, not upon the question of law, but upon the facts.   Mr. Justice JACKSON, after reviewing the facts, says: "It is thus shown that, in addition to what was actually received, there was tendered by the railway company, at the place and in the manner provided for in the contract, 8,685,269 bushels which the elevators could not accept and did not receive and store.   The amount so tendered, with that actually received, exceeded the total amount which the railroad company agreed that the lessees should have the opportunity to accept and store, and this we hold to be a full and

complete compliance by the railway company with the terms and true meaning of its covenant. To hold otherwise would render the railway company liable for the inability of the lessees to accept the performance that was offered by it. It would require the clearest and most unqualified understanding on the part of the railway company to subject it to such a liability."

Read in connection with this statement, and bearing in mind that the court below held the railroad company liable upon the ground that the elevator company had not " received " the grain, though it had actually been tendered in good faith, the comments of the court, as cited in the syllabus, cannot be construed to sustain the contention of the defendant in this action. The court said : " There can be no question that a party may, by an absolute contract, bind himself or itself to perform things which subsequently become impossible, or pay damages for the non-performance, and such construction is to be put upon an unqualified undertaking, where the event which causes the impossibility might have been anticipated and guarded against in the contract, or where the impossibility arises from the act or default of the promisor. But where the event is of such a character that it cannot be reasonably supposed to have been in the contemplation of the contracting parties when the contract was made, they will not be held bound by general words, which, though large enough to include, were not used with reference to the possibility of the particular contingency which afterward happens."

That is to say, where a railroad company enters upon a contract with an elevator company, agreeing that it shall receive a certain quantity of grain from its lines, the contract is to be construed that the elevator company is to have the opportunity to receive such an amount, and not that the railroad company shall be obliged to make the company receive what it cannot receive. The contract was for the benefit of the elevator company ; it was interested in being assured of a profitable business, and all that the railroad company or the elevator company had in mind was the delivery at the elevators of a certain quantity of grain, and this reasonable interpretation was given it by the Supreme Court. There is no such question involved in the case now under consideration. There is no uncertainty in the language ; it was deliberately entered into to accomplish certain results, and was undertaken in consideration of a large sum of

money, and there can, therefore, be no question as to the right of the plaintiff in this action; he is entitled to a decree in accord with the alternative covenants of the contract entered into by the parties on a full understanding of the case, and it is so ordered.

Judgment reversed and a new trial ordered, with costs to the appellant to abide the event.