ELLAMAR MINING CO. v. ALASKA S. S. CO.

(Circuit Court of Appeals, Ninth Circuit.
May 25, 1925. Rehearing Denied
June 29, 1925.)

No. 4390.

**1. Shipping ⊜104—Contract for carriage held terminated by requisitioning of carrier's vessels.**

A contract, made in 1913, by a shipowner to carry the ore from a copper mine to the smelter for a term of five years, *held,* terminated by the requisitioning of the carrier's vessels by the government for war purposes before expiration of the term.

**2. Shipping ⊜104 — Continuing contract of carriage, not disapproved by Shipping Board, held valid.**

The provision of Shipping Board Act Sept. 7, 1916, § 15 (Comp. St. § 8146h), that "agreements existing at the time of the organization of the board shall be lawful until disapproved by the board," *held* to apply to a continuing contract for carriage between a carrier and shipper.

In Error and Cross-Error to the District Court of the United States for the Northern Division of the Western District of Washington; Jeremiah Neterer, Judge.

Action at law by the Ellamar Mining Company against the Alaska Steamship Company. Judgment for plaintiff, and both parties bring error. Affirmed.

These are cross-writs of error. The basis of the action, which was for damages, brought by the mining company against the steamship company, was a contract entered into between those parties in September, 1913, by means of an offer in writing made by the steamship company to the mining company and its acceptance by the latter. The mining company was operating a mine at Ellamar, Alaska, and was shipping its ore to the Tacoma smelter, at Tacoma, Wash., with which smelter it had a contract concerning such shipments. The steamship company's offer, which, as has been said, became the contract between it and the mining company by virtue of the acceptance of the offer, is as follows:

"Alaska Steamship Company.

"Seattle, Washington, September 25, 1913.

"R. W. Baxter, Vice President, Ellamar Mining Company, Seattle, Washington— Dear Sirs: (1) Referring to your supplies to Ellamar and output of ore from Ellamar to Tacoma:

"(2) We hereby offer these arrangements for your acceptance, and, if in accordance with your understanding, will you please sign one copy of this letter and return for our file?

"(3) It is understood and agreed that in making your shipment of supplies and equipment to Ellamar, you will favor the Alaska Steamship Company, and route all of your shipments by steamers of this company as far as you possibly can, arranging as far as possible to place your orders for forwarding supplies on the freight steamers which are to call at Ellamar for ore, such shipments to take current tariff rates.

"(4) It is understood and agreed that you will ship your entire output of ore from Ellamar by steamers of the Alaska Steamship Company. It is understood that at the present time your output is about 3,000 tons per month, but the location of your ore bunkers and the depth of water are such that our passenger steamers cannot get to the bunkers, and cargo steamers can get in and out with only part of a cargo. It is therefore understood that, while we shall have the handling of your entire output, and that we will make every effort to move same with our own steamers, it is further understood that we shall have the privilege of calling on other lines, if necessary, but that no shipments will be made by steamers other than those of the Alaska Steamship Company, except under arrangements through this company:

"(5) Provided, however, in case at any time during the life of this agreement the Alaska Steamship Company shall be unable to or does not handle your ore without unreasonable delay, it is understood and agreed that during such period of disability or failure on our part you will be at liberty to forward your ore by some other means.

"(6) In case of shipwreck, detention by wreck, or such similar causes, we are unable to handle your entire output with our own ships, we agree to handle it with other ships, if it is possible to secure them.

"(7) It is further understood that you expect, on or about January 1, 1914, to increase your output to 5,000 tons per month, and that you will at once proceed to increase your facilities, and construct a tramway across the reef into deep water, and provide bunkers which will carry 2,500 to 3,000 tons of ore, and place yourselves in a position to deliver us full cargoes from bunkers located at a point accessible to any of our steamers, constructing your bunkers in such a way that ships can take full cargoes at any stage of tide at rate of not less than 100 tons per hour.

"(8) It is understood that, while handling ore from your present bunkers before com-

pletion of your wire tramway, we will make every effort to move the ore without delay or inconvenience to you, and that after you construct your tramway to deep water, and are in position to deliver full cargoes to any of our ships, we will, subject to the provisions of paragraph No. 6 hereof, move your entire output of 5,000 tons of ore per month without any delay to your mining operations, excepting as may be caused by strikes, shipwrecks, detention by wreck, or weather conditions, or such similar causes beyond our control.

"(9) The rate for handling the ore to be $2.50 per ton of 2,000 pounds.

"(10) This agreement will continue in effect for a period of five years from date hereof, or for so much of said period after January 1, 1914, as you are prepared to profitably move or ship 5,000 tons of ore per month. In case you find it unprofitable, or for any other reason you do not produce 5,000 tons of ore per month, but carry on your operations, producing and shipping a smaller quantity per month, it is agreed that we shall be given and shall furnish the carriage of such smaller quantity of ore under the terms of this agreement.

"Yours truly,

"Alaska Steamship Company,

"By R. W. Baxter, Vice President.

"Accepted:

"Ellamar Mining Company,

"By F. M. Jordan, President."

The amended complaint of the plaintiff alleged that its contract with the smelting company required the latter to purchase all of the ore and concentrates of the mine containing 1 per cent. or more of copper for a period of five years from January 1, 1914, up to a maximum tonnage of 5,000 tons per month—a copy of the contract being attached to the amended complaint. The latter also alleged in effect that during the term of the contract it was economically impracticable for the plaintiff to secure other means than the ships of the steamship company with which to transport its ore to Tacoma, and impossible to ship such ore to that place by any other means; that the defendant steamship company knew of the contract between the plaintiff and the smelting company, and that the contract in question was made with reference thereto. The amended complaint also alleged that the plaintiff complied with subdivision 7 of the contract in question, and that during the years 1916, 1917, and up to September 25, 1918, the plaintiff operated its mine and shipped the ores therefrom in certain stated amounts; that during the year 1916 the plaintiff mined and shipped on defendant's vessels to the Tacoma Smelting Company, at Tacoma, Wash., 43,000 tons of its ore, but could and would have mined for shipment and have shipped to said Tacoma Smelting Company at Tacoma 12,000 additional tons of such ore, if the defendant had furnished carriage for it, which the defendant failed to do, whereby the plaintiff lost $91,800.

The amended complaint further alleged that during the year 1917 the plaintiff mined 55,000 tons of ore, all of which the defendant carried, and that during and up to September 25 of the year 1918 the plaintiff mined 33,925 tons of ore, of which the defendant carried 24,245 tons only, whereby the plaintiff lost $52,272, and the further sum of $4,840, by reason of rehandling those 9,680 tons, and that the plaintiff could and would have mined and had ready for shipment, during the first $8\frac{5}{6}$ months' period of 1918, 10,241 tons of ore additional to that actually mined, if the defendant had furnished the plaintiff shipping facilities therefor, whereby the plaintiff lost $10,241 on account of such 10,241 tons not mined. The amended complaint further alleged that upon the termination of the plaintiff's contract of shipment with the defendant, on, to wit, September 25, 1918, and upon the termination of its contract with the Tacoma Smelting Company for the purchase of its ore, by reason of the depreciation of the market value of copper and of the other ores derived from the said mine, and by reason of the increased cost of smelting said ore and the increased cost of shipping the same from Ellamar to a point where it could be marketed, the operation of the mine became wholly unprofitable, and the plaintiff operated the same at a loss until the middle of January, 1920, when it was wholly abandoned. It was further alleged that until it was so abandoned the plaintiff had therein ore to the amount and of the grade sufficient to make the additional shipments of the values alleged, which additional ore the smelting company was bound and willing to purchase.

The prayer was for damages in the sum of $150,153, with interest thereon from September 25, 1918. As the complaint affirmatively shows that all the ore mined by the plaintiff during the year 1917 was transported by the defendant to the smelter, no further reference need be made to the operations during that year.

As affirmative defenses to the plaintiff's allegations covering the year 1916 and that portion of 1918 to September 25, the defendant steamship company set up, among other things:

(1) That at the time of the making of the contract in question the defendant was a common carrier of freight and passengers by steamships between Tacoma and Seattle, Wash., and various ports and places in the territory of Alaska. That one of the regular routes upon which it so operated a portion only of its vessels was between Seattle and Tacoma, Wash., and Cordova, Ellamar, Valdez, Seward, and Anchorage, in southwestern Alaska, Ellamar being a regular port of call for the defendant's vessels. That upon the said route there were located at the time many mines, salmon canneries, and other large manufacturing plants and business establishments, as well as large cities and communities, all of which depended to a large extent upon the defendant's vessels to carry their products and their supplies. That prior to the making of the contract in question, to wit, on or about August 30, 1915, one of the defendant's largest freight-carrying vessels so used upon such route, Edith by name, was wholly lost through perils of the sea, and on or about November 18, 1917, after the making of the contract, another of its vessels, called the Mariposa, used in carrying ore for the plaintiff, was also wholly lost through a similar peril. That the loss of such vessels made it impossible for the defendant to carry all of the plaintiff's ore in 1916, 1917, and 1918, in its own vessels, and that it was impossible for the defendant during said time to secure other vessels sufficient to enable it to carry 5,000 tons of ore per month, but alleges that it did carry or cause to be carried all ore mined by the plaintiff and offered for shipment during all of those years up to and including September 25, 1918, either in its own vessels or in other vessels furnished by it. That during 1916 it carried 35,250.36 tons of such ore in its own vessels and 8,713.77 tons for the plaintiff in other vessels furnished by the defendant, being the entire amount of ore mined or offered to the defendant by the plaintiff for shipment during the year 1916. That during the year 1918, prior to September 25 thereof, all ore mined by the plaintiff and offered for shipment was carried in vessels owned by the defendant and operated by it either as owner or agent. That after the enactment by Congress of its Shipping Act, approved September 7, 1916, pursuant to its provisions and requirements,

the defendant duly established rates, charges, and classifications for the carriage of freight, including ore, between Ellamar, Alaska, and Seattle and Tacoma, Wash., and duly issued and filed with the United States Shipping Board its through and local freight tariff, naming commodity rates between Tacoma and Seattle, Wash., and Unalaska, Alaska, and intermediate points, which tariff was designated and known as "Supplement No. 4 to Tariff No. 262," effective January 1, 1917. That in and by said tariff there was duly established and fixed a lawful freight rate on ore such as was mined and shipped by the plaintiff and referred to in the contract in question, between Ellamar, Alaska, and Tacoma smelter wharf, Tacoma. That at all times subsequent to the filing and taking effect of that tariff the same was binding upon both plaintiff and defendant, and that all ore carried by the defendant for the plaintiff was under and pursuant thereto, and not otherwise, and that no ore was thereafter carried by the defendant for the plaintiff under or by virtue of the contract in suit.

(2) The commencement and existence of the World War, into which the United States entered, and of which the courts, also, of course, take judicial notice. That during all times during that war the United States Shipping Board, subsequent to its creation, had the power to requisition American vessels, and between October 17 and November 25, 1917, duly requisitioned and took over all of the defendant's vessels having a carrying capacity of 2,500 tons or over, being all of its vessels except the Henry T. Scott, then employed on the Atlantic Coast, which was also so requisitioned and taken over April 2, 1916, and except, also, five small vessels, of less than 2,500 tons capacity, which were not operated on the route above mentioned, and were either unfit or incapable of carrying plaintiff's ore. That, upon the requisitioning of the said vessels by the United States Shipping Board, the same were operated by it for and on behalf of the United States government, the defendant acting merely as agent for the Shipping Board in the operation of some of the said vessels until subsequently released by it to the defendant. That the said vessels were so requisitioned and taken over by the Shipping Board for an indefinite, undetermined length of time, by reason of which the defendant was wholly prevented from performing the contract in question, which was thereby wholly frustrated without fault on the part of the defendant.

By its answer the defendant to the action also set up certain counterclaims against the plaintiff, the validity of which were admitted by the plaintiff. By its instructions the trial court took from the jury the consideration of any damage alleged to have been sustained by the plaintiff during the year 1918, and submitted to it the question of damages alleged to have been sustained by the defendant's alleged breach of the contract during 1916, which amount the jury by its verdict fixed at $12,250, after deducting the amount admitted to be due the defendant from the plaintiff on the counterclaims. Judgment followed accordingly.

Peters & Powell and George E. de Steiguer, all of Seattle, Wash., for plaintiff in error and cross-defendant in error.

W. H. Bogle, Lawrence Bogle, F. T. Merritt, and Lane Summers, all of Seattle, Wash., for defendant in error and cross-plaintiff in error.

Before GILBERT, ROSS, and RUDKIN, Circuit Judges.

ROSS, Circuit Judge (after stating the facts as above). [1] An unusually large number of decisions are cited on behalf of both parties to the controversy, to review which would be quite impossible in an opinion of any reasonable length; nor do we think it at all necessary to do so, being of the opinion that the correctness of the ruling of the court below, to the effect that the contract between the parties was terminated by the taking over of the ships of the defendant company under the requisition by the government, is sufficiently shown by these declarations of the Supreme Court in the case of Texas Co. v. Hogarth Shipping Co., 256 U. S. 619, 629, 630, 631, 41 S. Ct. 612, 614 (65 L. Ed. 1123):

"It long has been settled in the English courts, and in those of this country, federal and state, that where parties enter into a contract on the assumption that some particular thing essential to its performance will continue to exist and be available for the purpose, and neither agrees to be responsible for its continued existence and availability, the contract must be regarded as subject to an implied condition that, if before the time for performance and without the default of either party the particular thing ceases to exist or be available for the purpose, the contract shall be dissolved and the parties excused from performing it. Taylor v. Caldwell, 3 Best & Smith, 826, 839; In re Shipton, Anderson & Co., [1915] 3 K. B.

676; Horlock v. Beal, [1916] 1 A. C. 486, 494, 496, 512; Bank Line, Ltd., v. Arthur Capel & Co., [1919] A. C. 435, 445; The Tornado, 108 U. S. 342, 349–351; Chicago, Milwaukee & St. Paul Ry. Co. v. Hoyt, 149 U. S. 1, 14, 15; Wells v. Calnan, 107 Mass. 514; Butterfield v. Byron, 153 Mass. 517; Dexter v. Norton, 47 N. Y. 62; Clarksville Land Co. v. Harriman, 68 N. H. 374; Emerich Co. v. Siegel, Cooper & Co., 237 Ill. 610. The principle underlying the rule is widely recognized and applied to various classes of contracts. The Kronprinzessin Cecilie, 244 U. S. 12, 22–24. But, of course, it does not apply where the risk is fully covered by a term of the contract, nor where performance is not practically cut off, but only rendered more difficult or costly. Columbus Railway, Power & Light Co. v. Columbus, 249 U. S. 399, 410 et seq. Perhaps the oldest and most familiar application of the principle is to contracts for personal service, where performance is prevented by death or illness. Robinson v. Davison (1871) L. R. 6 Exch. 269; Spalding v. Ross, 71 N. Y. 40.

"Another application widely recognized is where a ship chartered for a voyage, after the date of the charter party and before the time for the voyage, is accidentally destroyed by fire, lost at sea, or injured in such degree as not to be available for the service. The Tornado, supra, was a suit on a contract of affreightment, where the ship, before beginning the voyage, was accidentally burned and thereby prevented from undertaking it. This court held that the contract was dissolved, saying (page 349): 'We are of opinion that, by the disaster which occurred before the ship had broken ground or commenced to earn freight, the circumstances with reference to which the contract of affreightment was entered into were so altered by the supervening of occurrences which it cannot be intended were within the contemplation of the parties in entering into the contract, that the shipper and the underwriters were absolved from all liability under the contract of affreightment. The contract had reference to a particular ship, to be in existence as a seaworthy vessel and capable of carrying cargo and earning freight and of entering on the voyage. All the fundamental conditions forming part of the contract of the shipowner were wanting at the time when the earning of freight could commence.'

"Here the ship, although still in existence and entirely seaworthy, was rendered unavailable for the performance of the charter

party by the requisition. By that supervening act she was impressed into the war service of the British government for a period likely to extend—and which as it turned out did extend—long beyond the time for the charter voyage. In other words, compliance with the charter party was made impossible by an act of state, the charterer was prevented from having the service of the ship and the owner from earning the stipulated freight. The event apparently was not anticipated and there was no provision casting the risk on either party. Both assumed that the ship would remain available, and that was the basis of their mutual engagements. These, we think, must be regarded as entered into on an implied condition that, if before the time for the voyage the ship was rendered unavailable by such a supervening act as the requisition, the contract should be at an end and the parties absolved from liability under it.

"That the charter party was entered into in this country is not material. The important consideration is that it became impossible of performance through a supervening act of state, which operated directly on the ship and the parties could not avoid."

The contract between the parties was, therefore, terminated upon the taking over of the ships under their requisition by the government.

[2] It is insisted, however, on the part of the plaintiff in error steamship company, that the contract was rendered absolutely void by the provisions of the Shipping Act of September 7, 1916. The conclusive answer to the argument made in that behalf is that the steamship company neither alleged nor proved that the contract, which admittedly was in existence at the time of the passage of that act, was disapproved by the Shipping Board. In its section 15, the Act of September 7, 1916 (39 Stat. 734 [Comp. St. § 8146h]), expressly declares: "Agreements existing at the time of the organization of the board shall be lawful until disapproved by the board. It shall be unlawful to carry out any agreement or any portion thereof disapproved by the board."

It is contended that section 15 refers only to such agreements as are by the statute required to be filed with the board, and that the statute contains no requirement that any contract between a carrier and a shipper be so filed, this being the reasoning of counsel:

"We think the court overlooked the fact that section 15 of the act relied upon by plaintiff requires the filing with the Shipping Board of copies of contracts between 'every common carrier by water, or other person subject to this act,' and 'any other such carrier or other person subject to this act.' The act expressly defines who are persons subject to the act, and these do not include shippers. Therefore there is no requirement that a contract between a carrier and a shipper should be filed with the Shipping Board. It seems to us clear that this entire section refers solely to agreements required to be filed, and we fail to understand how the act can be construed as making contracts valid until disapproved by the Shipping Board when such contracts are not required, nor even permitted, to be filed with that board. How could the board approve or disapprove a contract of which it knew nothing? If a carrier, when accused of discrimination in violation of the other provisions of the Shipping Act, could completely exonerate itself by showing that it had an undisclosed existing contract which had never been filed with, known to, or disapproved by the Shipping Board, certainly the entire purpose of the act would be defeated."

We are unable to see any merit in that reasoning. There is, in our opinion, no mistaking the meaning of the language of the statute, expressly declaring that "agreements existing at the time of the organization of the board shall be lawful until disapproved by the board." To hold that shippers through carriers by water are "not subject to the act" is wholly inadmissible. The record shows that on the trial evidence was given tending to show that the plaintiff mining company could and would have mined and shipped from its mine during the year 1916 ore up to the average of 5,000 tons per month for the entire year, but for the irregularity and infrequency of the calling of the defendant's ships at Ellamar, contrary to the requirements of the contract, in consequence of which the plaintiff company was prevented from shipping the maximum tonnage during 1916 provided for by the contract, which it could and would have done at a profit, but for the steamship company's default, and which ore subsequently became unprofitable to ship, and therefore to mine. Such evidence was the basis of the verdict that was returned in the plaintiff's favor, and we are unable to hold that it was insufficient.

The judgment is affirmed; neither party to recover costs of this court.